# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5658 | **DATE** | 11/2/2001 |
| **CASE TITLE** | FIDELITY vs. INTERCOUNTY | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [378-1] is granted in part and denied in part. Judgment is entered for defendants Stewart Information Services Co., Stewart Title Guaranty Co., and Stewart Title Co. and against plaintiff Fidelity National Insurance Co. of New York on Counts I, VI and VIII. The motion is granted on Count VII as it pertains to Fidelity's unjust enrichment claim asserted in its own capacity. The motion is denied on Count VII as it pertains to Fidelity's unjust enrichment claim as subrogee and assignee. The joint final pretrial order and agreed jury instructions as to the surviving claims in Count VII shall be presented on November 28, 2001 at 9:00 a.m. Fidelity's draft shall be submitted to the Stewart defendants by November 19, 2001. ENTER MEMORANDUM OPINION AND ORDER.

(11) ■ [For further detail see order attached to the original minute order.]

*Suzanne B. Conlon*

| | | | number of notices | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | NOV 13 2001 | | 446 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | CM | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 11/1/2001 | | |
| | | | date mailed notice | | |
| SB | courtroom deputy's initials | 01 NOV -9 PM 4:56 | CB | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |



NOV 1 3 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FIDELITY NATIONAL TITLE )
INSURANCE COMPANY OF )
NEW YORK ) No. 00 C 5658
)
Plaintiff, ) Suzanne B. Conlon, Judge
)
v. )
)
INTERCOUNTY NATIONAL TITLE )
INSURANCE COMPANY, et al. )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Fidelity National Title Insurance Company of New York ("Fidelity") brings this action in its own capacity and as an assignee and subrogee of escrow beneficiaries for fraudulent concealment (Count I), breach of fiduciary duty (Count II), assisting in the breach of fiduciary duty (Count III), breach of escrow contract (Count IV), violation of the Illinois Consumer Fraud Act (Count V), violation of the Illinois Title Insurance Act, 215 ILCS § 155/21(a) (Count VI), unjust enrichment (Count VII), conversion (Count VIII), fraudulent transfers (Count IX), negligence (Count X), subrogation (Count XI), and implied indemnity (Count XII). Fidelity seeks to recover damages caused by an allegedly fraudulent scheme to loot millions of dollars from real estate escrow accounts held first by Intercounty Title Company of Illinois ("Old Intercounty") and later by Intercounty Title Company ("New Intercounty"). Fidelity sues Stewart Title Co., Stewart Title Guaranty Co., and Stewart Information Services Corp. (collectively "Stewart"). On May 2, 2001, this court dismissed

1

with prejudice Counts III, V, and IX-XII. Counts II and IV are not asserted against Stewart. Counts I, VI, VII, and VIII remain. Stewart moves for summary judgment on all remaining counts pursuant to Fed. R. Civ. P. 56.[1]

## BACKGROUND

### A.     The Relevant Parties

All facts are undisputed unless otherwise noted. Fidelity is a title insurance company. From November 1995 to June 23, 2000, Fidelity acted as reinsurer for Intercounty National Title Insurance Co. ("INTIC"), another title insurance company. During this time period, INTIC was the exclusive underwriter for New Intercounty. New Intercounty was INTIC's exclusive agent for issuing title insurance policies in Illinois. New Intercounty acted as an escrow agent by holding funds for real estate transactions.

Stewart acted as the exclusive underwriter for Old Intercounty until 1995. Between 1984 and 1995, Old Intercounty was the exclusive title and escrow insurance agent for Stewart. In addition to its title policy, Stewart issued closing protection letters. These letters insured parties to Old Intercounty's escrow account against losses in the event Old Intercounty failed to follow real estate closing instructions. Stewart owned 20% of Old Intercounty's stock and held two seats on its board of directors for a period of time. As a result of the business relationship between Stewart and Old Intercounty, Stewart had access to periodic reports concerning Old Intercounty's finances.

ITI Enterprises, Inc. ("ITI") provided staffing and services for INTIC and New Intercounty

---

[1] Stewart sues Fidelity for tortious intereference with contract in a separate case before this court. *Stewart Title Guaranty Co. v. Fidelity Nat'l Title Ins. Co.*, No. 00 C 7086. This court denied Fidelity's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on February 13, 2000. The parties have not filed motions for summary judgment in No. 00 C 7086.

and controlled New Intercounty's escrow account. Laurence W. Capriotti was president and director of Old Intercounty and president of ITI. He owned 40% of Old Intercounty's stock and 50% of ITI's stock. Terry Cornell was vice-president of Old Intercounty and later became vice-president and secretary of INTIC and New Intercounty. He owned 49% of INTIC Holding's stock. Jack L. Hargrove was Old Intercounty's executive vice-president, and chairman of Old Intercounty and ITI's board of directors. He owned 40% of Old Intercounty's stock and 50% of ITI's stock. Alan L. Hurwick acted as director for Old Intercounty. For a period of time, he was also Old Intercounty's treasurer and chief financial officer. Susan Peloza was executive vice-president, secretary, and director of Old Intercounty, president of INTIC, and vice-president of New Intercounty. She owned 51% of INTIC Holding's stock.

## B.    Stewart and Old Intercounty

In 1986, Old Intercounty developed a mortgage defeasance program. The program allowed the transfer of title to large commercial properties without triggering high pre-payment penalty first liens. Instead of paying the first lien, Old Intercounty created an escrow fund used to invest the pay-off proceeds in high-yield junk bonds. The goal was to obtain higher returns from bonds required to pay down the lien. This program depended on the continuing strength of the junk bond market. Stewart was liable under the title policy if Old Intercounty defaulted on its loan payments.

In 1990, the junk bond market collapsed. Old Intercounty lost millions of dollars. Stewart reduced its capital stock interest in Old Intercounty to less than 20%. Stewart completed an audit of Old Intercounty in December 1990. The audit revealed a shortage in the escrow account. Stewart and Old Intercounty worked out an agreement to correct the deficiency.

In 1995, Stewart determined Old Intercounty was still delinquent in reconciling its escrow

account. A December 1993 reconciliation statement indicated a shortage of $6 million. Stewart directed Old Intercounty to balance its account by May 1995. In February 1995, Stewart and Old Intercounty engaged in negotiations to settle outstanding escrow disputes. Old Intercounty informed Stewart it needed $6 million to balance the escrow account. In April 1995, Old Intercounty informed Stewart the deficiency remained at $4 million. Old Intercounty agreed to balance all accounts by November 1995. In April 1995, Stewart and Old Intercounty executed a restructuring agreement, which attempted to correct the escrow deficiency. In November 1995, Stewart conducted an audit of Old Intercounty's escrow account, and reviewed April and May 1995 reconciliation statements. Larry Davis, Stewart's Director of Audit Services, concluded the account was reconciled, except for a minor deficiency of $90,000. Davis reported his results to Malcolm Morris, president of Stewart Title Guaranty. After the 1995 audit, Stewart continued to seek current escrow statements from Old Intercounty. However, on November 20, 1995, Old Intercounty informed Stewart their relationship was terminated effective December 31, 1995.

The Stewart-Old Intercounty restructuring agreement permitted formation of a new title company to act as an underwriter. In September 1995, INTIC and New Intercounty were formed to replace Stewart. Peloza, Cornell, Hargrove, and Capriotti were part of INTIC and New Intercounty management. The restructuring agreement gave INTIC very little authority and few assets. In order to obtain regulatory approval, Fidelity was hired on September 14, 1995 to reinsure INTIC's title policies and issue closing protection letters. Indeed, Fidelity was aware of the formation of New Intercounty before September 1995 and sought its business. Fidelity and INTIC executed an "Automatic Reinsurance Agreement" that permitted INTIC to issue insured closing letters jointly signed by Fidelity and INTIC. Fidelity assumed liability for losses due to missing escrow funds.

4

Fidelity allowed INTIC to attach reinsurance certificates to its policy, increasing its liability and exposure by providing the policyholders direct access to the reinsurer. The parties dispute whether Stewart knew of the Fidelity-INTIC relationship before September 14, 1995. Pl. 56.1 Facts at ¶¶ 265-68.

## C. Fidelity's Pre-Signing Investigation.

Cornell, a principal of Old Intercounty and INTIC, was arrested in 1994 and charged with multiple counts of perjury. Cornell's background was unknown to Fidelity prior to execution of the Fidelity-INTIC reinsurance agreement in September 1995. Thomas Simonton, an employee of Commonwealth Land Title Insurance Co., reviewed the Stewart-Old Intercounty underwriting agreement prior to execution of the Fidelity-INTIC reinsurance agreement. Simonton was negotiating with Fidelity for future employment. Simonton spoke with Harry Stirmwell at the Illinois Department of Financial Institution, who informed Simonton he had few complaints about Old Intercounty. Simonton had a conversation with Michael Skakla, Stewart Guaranty's general counsel, who informed him Old Intercounty generated a large number of small claims. Fidelity did not request Old Intercounty produce bank or reconciliation statements, or Old Intercounty financial documents. Fidelity did not audit Old Intercounty. Indeed, Fidelity did not audit any reinsured company until February 2000. After execution of the Fidelity-INTIC agreement, Fidelity appointed Simonton to oversee the Fidelity-INTIC relationship.

## D. Fidelity and New Intercounty

From October 1996 to April 1999, New Intercounty's escrow account experienced repeated multiple overdrafts of several million dollars. LaSalle Bank directed Capriotti to move the account to another financial institution. New Intercounty opened an escrow account at Harris Bank. The

overdrafts continued, and Harris Bank directed New Intercounty to close its account. On March 13, 2000, Fidelity conducted an audit of New Intercounty's escrow account, without objection from New Intercounty representatives. On March 24, 2000, Fidelity renewed the reinsurance agreement, agreed to cover deficiencies in New Intercounty's escrow account, and received authority to audit and monitor that account. On April 20, 2000, Fidelity discovered a deficit of over $40 million in New Intercounty's escrow account. On that basis, Fidelity immediately terminated the reinsurance agreement. On April 23, 2000, Fidelity reconsidered its termination of the reinsurance agreement, and executed a new agreement that guaranteed INTIC five years of reinsurance. In return, Fidelity received stock pledges and additional collateral. However, on June 23, 2000, Fidelity terminated the new agreement on suspicion of escrow fund mismanagement by INTIC and New Intercounty. Fidelity contends Old Intercounty and New Intercounty engaged in a Ponzi scheme for over 10 years, commingling funds and using incoming funds to cover prior debts.

As a result, the Illinois Department of Financial Institutions issued a cease and desist order to INTIC and New Intercounty. Hundreds of New Intercounty's customers and lenders received checks that failed to clear. On June 26, 2000, the Illinois Department of Financial Institutions appointed Fidelity to act as trustee of New Intercounty with authority to assure the proper disbursement of all escrow funds held by New Intercounty or its agents.

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource*

*Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## II.      Fraudulent Concealment [Count I]

To establish fraudulent concealment, Fidelity must demonstrate: (1) Stewart concealed a material fact; (2) Stewart's concealment was intended to induce false belief under circumstances creating a duty to speak; (3) Fidelity could not have discovered the truth through reasonable inquiry or inspection; (4) Fidelity would have acted differently had it been aware of the information; and (5) Fidelity's reliance on the omitted fact led to its injury. *Ruane v. Amore*, 287 Ill.App.3d 465, 476, 67 N.E.2d 1369, 1377 (1st Dist. 1997). Passive silence is sufficient to trigger the fraudulent concealment doctrine where the parties are in a continuing fiduciary relationship. *Pitts v. Unarco Indus., Inc.*, 712 F.2d 276, 279 (7th Cir. 1983). Fidelity asserts the fraudulent concealment claim in its own capacity and as subrogee and assignee of the escrow payees.

### A.      Reasonable Inspection or Inquiry

Stewart contends Fidelity failed to conduct reasonable due diligence to discover the deficiency in Old Intercounty's escrow account. In response, Fidelity relies on *TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822 (7th Cir. 1998). In *TRW Title*, the title insurer (TRW)

discovered a shortfall in the title agent's escrow account. TRW sued Security, the agent's former reinsurer, contending Security engaged in fraud by failing to disclose the shortfall. The court rejected TRW's fraud claim, holding that TRW failed to conduct reasonable due diligence because it neglected to conduct a pre-signing audit before executing the new agreement. TRW also failed to perform credit checks, investigate the agent's escrow practices and employees, and contact state licensing authorities. *TRW Title*, 153 F.3d at 825. The court noted a formal audit is "always a reasonable pre-signing measure [and] would have turned up the overdrafts and the even-amount withdrawals that should have dissuaded TRW from dealing with [the agent]" *Id.* at 828 n.4.

*TRW Title* is instructive. It is undisputed Fidelity failed to conduct a pre-signing audit of Old Intercounty's escrow account before it executed the Fidelity-New Intercounty reinsurance agreement in September 1995. Nor did Fidelity obtain Old Intercounty's financial statements. Fidelity failed to inquire into Old Intercounty's escrow practices. Fidelity did not conduct credit or background checks on Old Intercounty's principals. Those principals were slated to operate and manage New Intercounty.

In response, Fidelity advances other investigatory acts to demonstrate reasonable inquiry. Fidelity contends Simonton reviewed the Stewart-Old Intercounty underwriting agreement, and spoke with Michael Skakla (Stewart's general counsel). However, Simonton was not employed by Fidelity at that time. Def. 56.1 Facts at ¶ 82. Fidelity and Simonton were still in negotiations over Simonton's future employment. In addition, Simonton's brief conversation with Skakla only revealed that Old Intercounty generated numerous small claims. Pl. 56.1 Facts at ¶ 303. It is

undisputed Skakla and Simonton did not discuss Old Intercounty's escrow accounts.[2] Fidelity points to Simonton's review of Old Intercounty's claim history. Def. 56.1 Facts at ¶ 76-79. But that information only disclosed Old Intercounty's profitability in generating claims, not its escrow practices.

Fidelity asserts it was not obligated to audit Old Intercounty because it entered into an agreement with New Intercounty. That distinction is immaterial. Fidelity understood it was replacing Stewart as the title agent's reinsurer. *Id.* at ¶ 53. Simonton's conversation with Skakla and review of Old Intercounty claim history demonstrates Old Intercounty's practices were important to the new reinsurance agreement. Fidelity's first audit occurred in February 2000, without objection by Intercounty or INTIC. *Id.* at ¶¶ 123-24. New Intercounty and Old Intercounty funds were commingled without detection for more than four years. While Fidelity's failure to audit New Intercounty after 1995 is not at issue, that fact demonstrates the casual nature of the Fidelity-New Intercounty relationship.

Fidelity's failure to conduct reasonable due diligence is more egregious in light of the significant risk it assumed. Fidelity authorized New Intercounty to issue Fidelity-insured closing letters and reinsurance certificates, increasing its exposure and liability for escrow mismanagement. Title insurers face serious risk in the reinsurance industry, and "keep a close eye on their agents . . by auditing their escrow account." *TRW Title*, 153 F.3d at 824. Fidelity entered into a reinsurance agreement with a clear risk of fund mismanagement and embezzlement. Consequently, Fidelity fails

---

[2] Fidelity cannot rely on Simonton's conversation with Harry Stirmwell at the Illinois Department of Financial Institutions to show reasonable inquiry. Stirmwell was prohibited from disclosing confidential financial information to third parties. *See* 215 Ill. Admin. Code § 8100.3000; Def. 56.1 Facts at ¶ 93.

to raise a genuine issue it conducted a reasonable investigation of New Intercounty's escrow practices.

## B.    Fraudulent Intent

To establish Stewart concealed the escrow deficiency, Fidelity must demonstrate Stewart had knowledge of the Fidelity-INTIC agreement before execution. *TRW Title*, 153 F.3d at 828. Stewart contends it did not learn of the new reinsurance agreement until November 1995, three months after execution. Def. 56.1 Facts at ¶ 90. In response, Fidelity points to the Stewart-Old Intercounty restructuring agreement as evidence of Stewart's actual knowledge. But that agreement only permits Old Intercounty to organize a title insurance underwriter in the future. Pl. 56.1 Facts at ¶ 254. The agreement does not mention the Fidelity-New Intercounty transaction. Fidelity states Capriotti told Morris that Peloza was forming her own underwriter. *Id.* at ¶ 265. That conversation is irrelevant because it occurred three months after execution of the Fidelity-INTIC reinsurance agreement. *Id.* Furthermore, it is undisputed Skakla and Simonton did not discuss Fidelity's interest in Intercounty in September 1995. *Id.* at ¶¶ 302-303. Indeed, Fidelity lacked a motive to disclose the transaction -- Fidelity and Stewart are competitors in the underwriting and reinsurance industry. Def. 56.1 Facts at ¶ 86. Without more, Fidelity fails to create a genuine issue that Stewart had knowledge of the Fidelity-New Intercounty agreement before September 1995.

In addition, Fidelity fails to establish Stewart had actual knowledge of Old Intercounty's escrow deficiency before September 1995. Stewart contends the April 1995 restructuring agreement required Old Intercounty to rectify a deficiency of $5.9 million before November 1995. *Id.* at ¶¶ 29-30. That amount was timely deposited into Old Intercounty's escrow account. *Id.* at ¶ 35. Stewart asserts it did not know of the $40 million deficiency in the account. In response, Fidelity relies on

various transactions between 1986 and 1990 when Old Intercounty suffered deficiencies because the junk bond market collapsed. However, it is undisputed Stewart took action to correct deficiencies, and entered into a restructuring agreement to address that shortfall. *Id.* at ¶¶ 26-27. The 1990 transactions are irrelevant to Stewart's actual knowledge in 1995. Fidelity relies on a May 1995 bank reconciliation report from Old Intercounty that purportedly reveals a $50 million escrow deficiency. But Fidelity cannot demonstrate that report was available to Stewart before the Fidelity-INTIC reinsurance agreement. Def. 56.1 Facts at ¶ 33-35. Thus, the opinion of Fidelity's expert that Stewart should have discovered the deficiency from that report lacks foundation in the record. Pl. 56.1 Resp. at ¶¶ 33-35; *see also TRW Title Ins. Co. v. Security Union Title Ins.*, 887 F. Supp. 1032, 1035 (N.D. Ill. 1995) (expert testimony insufficient to establish actual knowledge of escrow deficiency).

Indeed, the crux of Fidelity's argument is that Stewart must have known of the deficiency because of the risks involved in underwriting, and the history of deficiencies in the escrow account. But Fidelity's assertions suggests Stewart's negligence in monitoring the escrow account, not actual knowledge of the $40 million shortfall. *Davis v. USN Comm.*, 121 F.Supp.2d 1183, 1196 (N.D. Ill. 2000) (summary judgment is appropriate when the inferences support negligence, not fraud). Mere suspicions are insufficient to establish Stewart's actual knowledge of escrow deficiencies. *TRW Title*, 153 F.3d at 828. Accordingly, summary judgment must be granted on Count I.[3]

---

[3] Because Fidelity has failed to demonstrate it conducted reasonable due diligence and Stewart intentionally concealed the escrow deficiency, Fidelity's contention that Stewart owed a duty to disclose the escrow deficiency is moot.

## III.  Unjust Enrichment

### A.  Fidelity's Unjust Enrichment Claim in its Own Capacity [Count VII]

To establish unjust enrichment, Fidelity must show: (1) it received a benefit; (2) to Fidelity's detriment; and (3) Stewart's retention of that benefit is unjust. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160, 545 N.E.2d 672, 679 (1989). Stewart benefitted when Fidelity extinguished its liability on the escrow deficiency. Fidelity suffered a detriment when it became liable for that shortfall under the Fidelity-INTIC agreement. The parties dispute whether Stewart's retention of that benefit is unjust.

In *TRW Title*, the court determined TRW's recklessness in failing to conduct reasonable due diligence precluded an unjust enrichment claim. *TRW Title*, 153 F.3d at 829 (citing *United States v. Burcyzk*, 556 F.2d 394, 397 (7th Cir. 1977)). The court held Security's retention of the benefit was not unjust. *Id.* *TRW Title* instructs that a title insurer's recklessness or negligence in failing to conduct a reasonable inspection of the escrow agent precludes relief under an unjust enrichment theory. *Id.* Fidelity failed to engage in reasonable due diligence by neglecting to conduct a pre-signing audit; obtain Old Intercounty's financial records; investigate Old Intercounty's escrow practices; and perform credit and background checks on management. Fidelity undertook a significant liability in an industry rife with risk of escrow mismanagement. Thus, Fidelity knowingly assumed the risk of a shortfall in New Intercounty's account. *Id.* at 828. Stewart's retention of the benefit must "violate the fundamental principals of justice, equity and good conscience." *Alliance Acceptance Co. v. Yale Insurance Agency Inc.*, 271 Ill.App.3d 483, 492, 648 N.E.2d 971, 977 (1st Dist. 1995). Fidelity's conduct precludes it from establishing Stewart's retention of the benefit is unjust.

**B.    Fidelity's Unjust Enrichment Claim as Subrogee and Assignee**

Fidelity's failure to conduct reasonable due diligence does not defeat its unjust enrichment claim as subrogee and assignee of the escrow depositors. The escrow beneficiaries were under no duty to independently conduct due diligence. *See TRW Title*, 153 F.3d at 829. Stewart challenges Fidelity's status as subrogee. Under Illinois law, the doctrine of subrogation allows a creditor to enforce rights of the payee by collecting from the party who should have discharged the debt. *Aetna Casualty & Surety Co. v. Chicago Insurance Co.*, 994 F.2d 1254, 1257 (7th Cir.1993) (citing *Dix Mutual Ins. Co. v. LaFramboise*, 149 Ill.2d 314, 597 N.E.2d 622, 624 (1992)). Although Illinois courts liberally apply subrogation principles, Fidelity must demonstrate: (1) it paid the debt in full; (2) Stewart was primarily liable for the debt; and (3) the escrow parties possessed a right enforceable against Stewart. *American Nat'l Bank and Trust Co. of Chicago v. Weyerhaeuser Co.*, 692 F.2d 455, 461 (7th Cir.1982). Subrogation prevents injustice and unjust enrichment. *Dix Mutual*, 149 Ill.2d at 319, 597 N.E.2d at 624. Fidelity must demonstrate the subrogors suffered a detriment, and their loss is traceble to Stewart's liability as underwriter before September 1995. Stewart contends summary judgment is warranted because Fidelity was primarily liable for the escrow deficiencies.

In *TRW Title*, the court denied summary judgment on TRW's unjust enrichment claim as subrogee. *TRW Title*, 887 F. Supp. at 1035-37. TRW raised a genuine issue for trial because it deposited funds in the escrow account to correct a debt originally belonging to Security, the former title insurer. *Id.* at 1035. Thus, the court held a reasonable jury could find TRW was not primarily liable for the debt. *Id.* at 1036. The court's finding at trial that TRW was primarily liable was affirmed. *TRW Title*, 153 F.3d at 829. The evidence at trial demonstrated TRW controlled Liberty, operated the escrow account on "the float", and used escrow funds in violation of TRW's escrow

agreements. *Id.* On that basis, TRW could not assert rights as subrogee.

Fidelity and Stewart rely on *TRW Title* but dispute the degree of control Fidelity exercised over New Intercounty's escrow account. Stewart contends Fidelity controlled New Intercounty by using funds from new business to cover obligations from old escrow debts. Def. 56.1 Facts at ¶ 131. Stewart further contends Fidelity authorized INTIC to continue issuing Fidelity insured closing letters after it discovered the deficiency, and wrote letters of support for INTIC. *Id.* at ¶¶ 132-37. In response, Fidelity advances evidence that suggests it only monitored the flow of money to ensure sufficient funds in the account for closings. Pl. 56.1 Facts at ¶¶ 325-329. Fidelity asserts it did not operate New Intercounty "on the float" but deposited $16 million to maintain its contractual obligations under the escrow agreement. *Id.* at ¶ 335. Fidelity further contends it conducted a four-month investigation to ensure New Intercounty was meeting its obligations. *Id.* at ¶¶ 335-39. Fidelity raises a genuine issue of fact as to whether it controlled New Intercounty to the point that it became primarily liable for the debt. *See Lawyers Title Ins. Corp. v. Frontier Title Co.*, No. 87 C 10872, 1989 WL 44186, at *1-4 (N.D. Ill. Apr. 24, 1989) (denying summary judgment when parties dispute title reinsurer's degree of control over escrow account).

In addition, Stewart contends Fidelity cannot assert rights as subrogee and assignee simultaneously. Fidelity claims it is a conventional or contractual subrogee. "Conventional subrogation arises from an agreement between the parties that the subrogee pay a debt on behalf of a third party, and in return, be able to assert the rights of the original creditor." *Aames Capital Corp. v. Interstate Bank*, 315 Ill.App.3d 700, 706, 734 N.E.2d 493, 498 (2d Dist. 2000). The insured closing letters jointly issued by INTIC and Fidelity provide that all rights and remedies of the escrow payees are subrogated to Fidelity. Pl. 56.1 Facts at ¶ 343. Fidelity also received assignment rights

14

from different escrow payees. Those escrow claimants executed written assignments of their rights and remedies to Fidelity. *Id.* at ¶¶ 346-47; *Hartford Casualty Ins. Co. v. Argonaut-Midwest Ins. Co.*, 854 F.2d 279, 282 (7th Cir. 1988) (valid assignment where assignee reimbursed assignor for rights to claim). "When an insurer is entitled to subrogation and likewise holds an assignment from the insured, it stands by definition, in the position of both an assignee and a subrogee." *Garrity v. Rural Mut. Ins. Co.*, 253 N.W.2d 512, 516 (Wis. Sup. Ct. 1977) (quoting Couch on Insurance 2d, § 61.105). Stewart confuses equitable subrogation with conventional subrogation. Equitable subrogation is a creature of equity and arises independently of a contractual agreement. *See* Couch on Insurance 3d, § 222:24. Stewart's reliance on *Federal Ins. Co. v. Basabe*, No. 88 C 10504, 1989 WL 134799, at *2-3 (N.D. Ill. Oct. 13, 1989) is misplaced. *Basabe* held a valid contractual assignment precludes an *equitable* subrogation action. Furthermore, Fidelity maintains it asserts its rights as subrogee and assignee as to different escrow payees. Pl. 56.1 Facts at ¶¶ 311, 346-347. Thus, Fidelity can assert an unjust enrichment claim as subrogee and assignee of the escrow beneficiaries.

Accordingly, summary judgment must be granted on Count VII as it pertains to Fidelity's claim asserted in its own capacity. Summary judgment must be denied on Count VII as it pertains to Fidelity's claim as subrogee and assignee.

## IV.    Conversion [Count VIII]

Fidelity asserts its conversion claim as subrogee and assignee of escrow beneficiaries. To establish conversion, Fidelity must demonstrate Stewart: (1) wrongfully assumed control, dominion, or ownership over property of the subrogors and assignors; and (2) the subrogors and assignors have an absolute and unconditional right to immediate possession of the property. *Voutiritas v. Intercounty*

*Title*, 279 Ill.App.3d 170, 186, 664 N.E.2d 170, 181 (1st Dist. 1996). Fidelity contends Stewart converted deposits from New Intercounty's escrow account because the funds were used to subsidize shortages in Old Intercounty's escrow account. Fidelity's claim is legally flawed. Stewart must have exercised dominion or control over New Intercounty funds. It is undisputed Stewart never received misappropriated funds from New Intercounty or INTIC. Def. 56.1 Facts at ¶¶ 186-87. Stewart last received a payment from Old Intercounty in April 1996. Those payments were submitted pursuant to valid contracts. *Id.*

While Stewart benefitted from the escrow transfers, it is undisputed Stewart did not orchestrate the alleged fraudulent transfer scheme. Nor does Fidelity contend Stewart had any involvement with New Intercounty's operation and management. Thus, Stewart could not have exercised dominion or control over the New Intercounty accounts. Furthermore, Fidelity has failed to demonstrate Stewart's actual knowledge of the escrow deficiency. Conversion is an intentional tort. *Kerrigan v. American Orthodontics Corp.*, 960 F.2d 43, 45 (7th Cir. 1992). Fidelity has not produced any evidence to support a reasonable inference that Stewart exercised wrongful dominion or control of the escrow account. Accordingly, summary judgment must be granted on Count VIII.

## V.    Illinois Title Insurance Act [Count VI]

The Illinois Title Insurance Act claim prohibits: (1) material misstatement or fraudulent misrepresentation in [the handling of escrow accounts]; (2) misappropriation or tortious conversion of money held in a fiduciary capacity; (3) untrustworthiness or incompetence in transacting business in such a manner as to endanger the public; and (4) material misrepresentation in the terms or conditions of contracts. 215 ILCS § 155/21(a). Section 25 provides, "Any person or persons who violate the prohibitions or limitations of subsection (a) of Section 21 of this Act shall be liable to the

person or persons charged for the settlement service involved in the violation for actual damages." 215 ILCS § 155/25.

In support of its § 21 claim, Fidelity reasserts its arguments on fraudulent concealment and conversion. As noted above, Fidelity has failed to establish Stewart knew of the escrow deficiencies before execution of the Fidelity-New Intercounty agreement. Fidelity has advanced no evidence of misrepresentation by Stewart about the escrow deficiencies. In addition, Fidelity cannot establish that Stewart is liable for conversion or misappropriation of the New Intercounty escrow funds. Misappropriation, like conversion, requires a wrongful taking. *Winklevoss Consul. V. Federal Ins. Co.*, 991 F. Supp. 1024, 1038 (N.D. Ill. 1998).

Fidelity asserts Stewart engaged in "untrustworthiness or incompetency in transacting the business of guaranteeing titles to real estate." 215 ILCS § 155/21(a)(3). Fidelity misapplies the principles of subrogation. Fidelity's § 21 claim is brought as subrogee of Fidelity's escrow payees from the year 2000. Fidelity concedes those rights arise pursuant to contract. But Fidelity's § 21 claim addresses the rights of pre-1995 escrow beneficiaries. Fidelity cannot assert the rights of escrow payees whose debts it did not extinguish. *Dix Mutual*, 149 Ill.2d at 319, 597 N.E.2d at 624. In addition, Fidelity advances no evidence the escrow payees from 2000 suffered actual damages by Stewart's purported incompetency between 1990 and 1995. Any purported damages that those escrow payees suffered occurred as a result of New Intercounty's actions after 1995. The Illinois Title Insurance Act requires "injury in fact fairly traceable to the defendant's actions." *Lawyers Title Ins. V. Dearborn Title*, 993 F. Supp. 1159, 1161-62 (N.D. Ill. 1998). Accordingly, summary judgment must be granted on Count VIII.

**CONCLUSION**

Stewart's motion for summary judgment is granted in part and denied in part. Summary judgment is granted on Counts I, VI and VIII. Summary judgment is granted on Count VII as it pertains to Fidelity's unjust enrichment claim asserted in its own capacity. Summary Judgment is denied on Count VII as it pertains to Fidelity's claim as subrogee and assignee.

November 2, 2001

ENTER:

Suzanne B. Conlon
United States District Judge