# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5658 | **DATE** | 2/6/2002 |
| **CASE TITLE** | | Fidelity vs. Intercounty | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the Memorandum Opinion and Order, Plaintiff's Motion to Compel Production of Documents from Susan Peloza and Also for Sanctions [370-1] is granted, and Susan Peloza shall pay the fees and expenses incurred by the plaintiff in bringing that motion. The parties shall follow the procedures set out in Local Rule 54 (d), (e) and (f) in the determination of the fees and expenses to be paid by Peloza to the plaintiff. Enter Memorandum Opinion and Order.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | FEB 07 2002 | 512 |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 2/6/2002 | |
| ✓ | Copy to judge/magistrate judge. | date mailed notice | |
| tw | courtroom deputy's initials | | |

DOCKETED

FEB 0 7 2002



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FIDELITY NATIONAL TITLE )
)
               Plaintiff, )     No. 00 CV 5658
)
            v. )     Judge Suzanne Conlon
)
INTERCOUNTY NATIONAL, et al. )     Magistrate Judge Geraldine Soat Brown
)
           Defendants. )

Geraldine Soat Brown, United States Magistrate Judge

## MEMORANDUM OPINION AND ORDER

Plaintiff's Motion to Compel Production of Documents from Susan Peloza and Also for

Sanctions [dkt 370] was referred to the Magistrate Judge by the District Judge for Order or Report

and Recommendation. [Dkt 365.] On August 23, 2001, this Court granted that part of the motion

seeking an order compelling production of documents and continued that part of the motion seeking

sanctions. [Dkt 383.] For the following reasons, this Court GRANTS that part of the motion seeking

sanctions, and enters sanctions pursuant to F. R. Civ. P. 37 as follows: Susan Peloza shall pay the

fees and expenses incurred by the plaintiff in bringing the motion.[1]

## BACKGROUND

[1] Whether, absent consent, the Magistrate Judge has jurisdiction on a motion for sanctions
under F. R. Civ. P. 37 to enter an order or is required to issue a report and recommendation
depends not on the sanctions sought but on the sanctions entered. *Gomez v. Martin Marietta
Corp.*, 50 F. 3d 1511, 1519-520 (10th Cir. 1995). An order to pay a monetary sanction is not
dispositive of a claim and therefore may be entered by the Magistrate Judge. *Phinney v.
Wentworth Douglas Hosp.*, 199 F. 3d 1, 6 (1st Cir. 1999).

The nature and factual background of this lawsuit were set out in the District Judge's Memorandum Opinion and Order dated November 2, 2001 [dkt 446] granting in part and denying in part a motion for summary judgment on claims brought by the plaintiff, Fidelity National Title Insurance Company of New York ("Fidelity"), against defendants Stewart Information Services Co., Stewart Title Guaranty Co., and Stewart Title Co. (collectively, the "Stewart Defendants"). The present motion was brought by Fidelity against defendant-counterplaintiff Susan Peloza alleging that Peloza deliberately concealed documents that Fidelity believes confirm the liability of the Stewart Defendants. (Mot. Compel at 1.) After the referral of the motion, this Court ordered Peloza's counsel to produce the documents in court on August 24, 2001. [Dkt 383.] On that day, Peloza's counsel appeared and reported that he was unable to produce the documents. The Court ordered Peloza to conduct a thorough search for the documents and to file an affidavit describing that search and responding to the motion for sanctions. [Dkt 385.] Peloza submitted an affidavit ("First Peloza Aff."[dkt. 389]) stating, in essence, that in May 2001 she had made copies of the documents sought and had shown the copies to a lawyer acting on her behalf in settlement negotiations, but she had subsequently thrown the copies into the garbage and was now unable to produce them. Two days of evidentiary hearings were held on Fidelity's motion for sanctions. As discussed below, at the first hearing, held on September 26, 2001, Peloza testified that she had made the copies at a warehouse from documents located there and thought that she might be able to locate the originals if she returned to the warehouse. Peloza was ordered to return to the warehouse and make a good faith effort to locate the documents that she copied in May 2001. (Minute Order, September 26, 2001 [dkt 430].) Peloza subsequently submitted a second affidavit ("Second Peloza Aff." [dkt 440]) in which she stated that she had searched the warehouse on October 4 and 5, 2001, but was unable to find the

contained in the Warehouse and Plaintiff is referred thereto." (*Id.*, Ex. C at 2-3.)

The "Warehouse" is the warehouse in South Holland, Illinois where certain Old Intercounty and New Intercounty documents were being stored. Two orders were entered in this case establishing protocols for access to the warehouse and copying of documents located therein. [Dkt 35 and 135.] Those orders require, *inter alia*, that only Copy Service personnel shall handle documents, and the party representatives may not bring briefcases or other containers into the warehouse. (Agreed Order of February 5, 2001 ¶4.) If a party selects documents for copying, that party's counsel shall make a log of each document selected for copying before the documents leave the warehouse. (*Id.* ¶3.) The log may be by groups of documents as long as the grouping does not impair identification sufficient for a party to determine whether it may contain privileged or otherwise objectionable information. (*Id.*) The log shall be immediately circulated to all other parties the same day that the documents are removed for copying. (*Id.*)

In May 2001, Peloza's counsel of record in this case approached Edwin Thomas, one of Fidelity's counsel, to discuss possible settlement. (Tr. Sept. 26, at 6.) Because Thomas would not deal with that counsel, Peloza asked attorney Alexander Lourie to contact Thomas. (*Id.* at 6.) Lourie had previously represented New Intercounty, INTIC and Old Intercounty in certain transactions. (Tr. Oct. 18, at 9-10.) Lourie contacted Thomas and discussed possible settlement, which would include Peloza's cooperation with Fidelity in the lawsuit. (*Id.* at 17.) Thomas provided Lourie with a list of eleven questions showing the areas in which Fidelity would be interested in having Peloza's cooperation. (*Id.* at 17; First Peloza Aff., Ex. A.) Lourie sent Peloza the list, and after discussing it with Peloza, told Thomas that Peloza would be able to provide assistance with respect to some of the questions. (Tr. Oct. 18 at 19.) Thomas told Lourie that Fidelity wanted not just testimony but

documents that she had copied in May 2001. The second evidentiary hearing, at which attorneys Alexander Lourie and Charles Sklarksy testified, was held on October 18, 2001. Briefs and exhibits were submitted by Fidelity [dkt 391, 398, 445, 465], Peloza [dkt 387, 423, 450] and the Stewart Defendants [dkt 359, 449].

## FACTS

The evidence showed the following. Susan Peloza is now and has been an officer of defendant Intercounty Title Company of Indiana (referred to by the parties as "New Intercounty"), defendant Intercounty National Title Insurance Company ("INTIC") and defendant INTIC Holding Company (collectively referred to as the "INTIC Defendants") since they were formed in 1995. (First Peloza Aff. ¶ 3.) Peloza and defendant Terry Cornell own New Intercounty and INTIC. (*Id.* ¶ 4.) Peloza had also been an officer of Intercounty Title Company (referred to as "Old Intercounty"), and a director of Independent Trust Company ("Intrust"). (Tr. Sept. 26, 2001 at 72-73.)

In December 2000, Fidelity served on Peloza, Cornell and the INTIC Defendants a document request seeking, *inter alia*, all documents referring or relating to Stewart Defendants' relationship with Intercounty, Laurence Capriotti or Jack Hargrove; the receipt of monies by Intercounty from the Stewart Defendants or the receipt of monies by the Stewart Defendants from Intercounty; and ownership and/or management of Intercounty by the Stewart Defendants. (Pl.'s Second Suppl. Brief in Supp. Mot. Compel [dkt 398], Ex. B at 3-5.) To the extent that they did not object to those requests, Peloza, Cornell and the INTIC Defendants responded that they had "none" of the requested documents but "Defendants further state that documents responding to this Request may be

documents. (*Id.* at 20.)

Peloza then made three visits to the warehouse to look for documents responsive to the list of questions. (Tr. Sept. 26 at 10-11.) The warehouse is about 24,000 square feet. It originally was used as a storage facility by ITI Enterprises and Old Intercounty, but later INTIC and New Intercounty also stored their closed files there. (Tr. Sept. 26 at 52.) All of the documents relating to closed real estate transactions from 1974 were there, as were other documents from the accounting and legal departments of Old Intercounty and ITI Enterprises and other paperwork. (*Id.* at 9.) Two truckloads of documents from the New Intercounty offices had also been brought there. (*Id.* at 10.)

In May 2001, there were many thousands of boxes of documents at the warehouse and many thousands of unboxed stacks of documents. (*Id.* at 52.) According to Peloza, it was "very chaotic," with stacks of documents on the floor loose throughout the warehouse in no order whatsoever. (*Id.* at 53-56.)

However, Peloza had previously spoken with Alan Hurwick, Old Intercounty's former accountant, who had told her that if she was looking for documents about Old Intercounty, she should look in files labeled with his name or that of the prior accountant (who Peloza believed was named Schroeder). Hurwick told her there was information there on Old Intercounty, Stewart and Independent Trust. (*Id.* at 13, 49.) So when she went to look for documents responsive to Fidelity's list of questions, she went to the areas with accounting records and past legal files. (*Id.* at 13.) She had not looked at those boxes before. (*Id.* at 14-15.) On the first day, after about seven or nine hours of looking, Peloza found two documents she thought were responsive. (*Id.* at 19.) She did not make copies; she left them where she found them. (*Id.* at 19.) On the second day, after about four or five hours of looking she found a few more documents. (*Id.* at 12, 19-20.) She made copies of those

documents and of those she had found the first day, using a fax machine that was at the warehouse. Then she put the originals back exactly where she had found them. (*Id* at 20-21.) She took the copies with her. In her opinion, the documents that she copied were "somewhat" responsive to the eleven questions. (*Id.* at 22.) On the third day, Peloza brought her own fax machine into the warehouse because the fax machine at the warehouse had stopped copying on the second day when she still had one more document to copy. She used her own fax machine to copy the last document from the second day and another document that she had found on the third day. (*Id.* at 23-24.) She pulled a total of five or six documents. (*Id.* at 20.) She put the originals back where she had found them and took the copies home. (*Id.* at 24-25.)

Peloza had previously been to the warehouse to pull files on real estate transactions for Fidelity's or Stewart's claims departments or to give access to other parties to view documents in the warehouse. (*Id.* at 15.) When she pulled files she took them to her attorney's office. (*Id.* at 86.) The three days that she went to the warehouse and located the documents responding to the eleven questions were the only times she had ever gone to the warehouse herself and made copies at the warehouse. (*Id.* at 86.) It is undisputed that no log of those copies was ever made or circulated. Peloza admitted she knew that the orders governing access to the warehouse applied to her. (*Id.* at 58-59.) She testified:

> Fidelity's counsel: But I think that you told Mr. Becka [her counsel] that had you removed them, you would have had to disclose that fact to the other parties in the case, right?
> Peloza: Yes.
> Fidelity's counsel: So by doing this copying, you were able to avoid having to disclose the fact of these documents to other parties, right?
> Peloza: Yes.

(*Id.* at 59.)

A few days later, Peloza brought the copies to a meeting with Lourie at the office of attorney Charles Sklarksy. (*Id*. at 26.) Sklarsky, who had previously represented Peloza individually, was brought into the settlement negotiations because Thomas wanted a litigator's view of the value of the documents. (*Id*. at 30, 57.) Peloza met with Lourie and Sklarsky for fifteen or twenty minutes over lunch. (*Id*. at 47, 62.) She showed them the copied documents and then left, taking the copied documents with her. (Tr. Sept. 26 at 28.) Lourie and Sklarsky did not make any copies of the documents. (Tr. Oct. 18 at 47, 49.) Both Lourie and Sklarsky testified that Peloza told them she got the documents from the warehouse. (*Id*. at 49, 63.) Shortly thereafter Sklarsky and Lourie together called Thomas. (*Id*. at 62.) Lourie told Thomas that the documents were responsive to some of the questions on the list. (*Id*. at 30-31.) He did not remember telling Thomas that the documents responded to particular questions. (*Id*. at 31.) The lawyers discussed the possibility that before any settlement agreement was reached Thomas would see the documents to make his own judgment about their value. (*Id*. at 30.)

Peloza stated in her first affidavit that she could not recall the documents except in the most general terms. (First Peloza Aff. ¶ 11.) In light of the responsible positions that she had held for more than a decade in the entities that were the subject of the documents, and the fact that on the second and third trips to the warehouse she was able to locate the same documents after putting them back in the chaotic mass of paper, her testimony on this point was less than credible. She said that one of the documents was an endorsement agreement or escrow agreement between Old Intercounty and Independent Trust. (Tr. Sept 18 at 71.) On cross-examination, she could not remember whether a document she herself had signed as a director of Intrust and had, by her testimony, had on her

kitchen counter for about two weeks (see below) was one of the five or six documents that she had pulled in response to Fidelity's questions. (*Id.* at 74.)

Lourie and Sklarsky had better memories of the documents. Lourie recalled that the documents included Old Intercounty documents. (Tr. Oct. 18 at 28.) The documents were from the late 1980s but prior to 1995 when he became involved with Intercounty. (*Id.*) He told Thomas that the documents showed that Stewart knew there was more than a $6.5 million hole in the escrow account. (*Id.* at 36.) One of the documents that he thought related to question eleven on the list[2] was a letter or a memo about a telephone conversation with a list of deficiencies in the escrow account in the $12 -13 million range. (*Id.* at 52.) It gave him the clear impression that both Stewart and Intercounty knew that there were problems "to the tune of the $12 to $13 million." (*Id.* at 53.) Sklarsky recalled that the documents were internal memoranda between individuals at Old Intercounty, and possibly one or two letters from the late 1980s or early 1990s. (*Id.* at 61.) For the most part there were Intercounty authors and recipients, but there was something in one of the documents that made him conclude that Stewart had knowledge of the contents of the documents. There was information in the documents about amounts of money that had been lost in various defeasance programs. He did not recall the documents showing that Stewart was aware of transfers of interest money into Old Intercounty's escrow. (*Id.*)

Lourie testified that he did not make copies of the documents Peloza brought because the goal of the conversation with Thomas was to get Fidelity interested in discussing settlement. Lourie

---

[2]Question 11 was: "Did Stewart know in 1995 that the ITI escrow account was deficient to a much greater amount than the amount set forth in the Restructuring Agreement?" (First Peloza Aff., Ex. A.)

thought that the documents were enough to "whet [Thomas'] appetite" but that before any settlement would be reached Thomas would examine the documents himself. (*Id.* at 48-49.)

Lourie and Sklarsky testified that the settlement negotiations were agreed to be confidential. (*Id.* at 38, 68-69.) They testified that their conversations with Thomas were phrased in hypotheticals, "what if these type of documents existed." (*Id.* at 27, 49, 68.) Sklarsky testified that the conversations were in the nature of a "proffer" as in a criminal case. (*Id.* at 69.) They denied that a condition of the settlement was that the documents would not be used at trial absent a settlement. (*Id.* at 38, 68.) The discussions were not going to be used as evidence at trial if the settlement did not succeed. (*Id.* at 38-39, 68.) However, Sklarsky testified that they were not telling Thomas that the documents existed "so he could issue a subpoena and subpoena the documents." (*Id.* at 69.) He testified that he did not know whether Fidelity had the documents. (*Id.* at 70.)

On August 9, 2001, Lourie's deposition was taken in this case and admitted in the hearings as Stewart Ex. 1. When asked at his deposition whether he understood that the documents had been produced in discovery, Lourie started to say that he thought they had not, and then stopped and said that he did not know what had been produced in discovery. (Lourie dep. at. 98-99.) At the evidentiary hearing, Lourie testified that he thought that Thomas had the documents, but "didn't know he had them." (Tr. Oct. 18. at 39.) Presumably Lourie meant that Thomas did not know the significance of the documents.

Peloza testified that after her meeting with Lourie and Sklarsky she brought the copies back to the home she shares with co-defendant Terry Cornell and put them on the kitchen counter. (Tr. Sept 26 at 28.) Lourie subsequently told her that Thomas was not interested in settlement, and about a week later Peloza threw the copies into the garbage. (*Id.* at 30-32.)

9

At Lourie's deposition, Peloza's counsel asked about the settlement negotiations. (Lourie dep. at 94-95.) Fidelity's counsel, Thomas, then asked about the documents that had been discussed in those negotiations and demanded that Peloza produce them. (*Id.* at 98-99, 111.)

At the evidentiary hearing on September 26, 2001, Peloza testified that she might be able to locate the documents again in the warehouse. She was ordered to return to the warehouse and make a good faith effort of at least eight hours to locate the documents. (Minute order, September 26, 2001.) [Dkt 430.] Subsequently she submitted her Second Affidavit stating that she had searched the warehouse on October 4 and 5, 2001, in the presence of representatives on behalf of Fidelity and on behalf of the Stewart defendants, and had been unable to locate any of the documents. (Second Peloza Aff. ¶¶ 3, 6, 7.) She stated that in the time between May and October 2001, the warehouse had been partially cleaned out. (*Id.* ¶5.)

Subsequent to the evidentiary hearings, as discussed above, on November 2, 2001, the District Judge entered summary judgment in favor of the Stewart defendants on certain of Fidelity's claims, finding, *inter alia*, that there was no evidence that Stewart was aware of the Fidelity-INTIC agreement before September 14, 1995 or that Stewart was aware of escrow deficiencies before September 1995. (Mem. Op. at 10-11.)

## DISCUSSION

The parties' arguments.

Fidelity's motion seeks sanctions against Peloza under various subsections of Rule 37. Fidelity's argument is, in essence, that Peloza's response to discovery requests was evasive; that she never produced in discovery the documents that she was able to locate and copy in the warehouse; that she intentionally held the documents as negotiating chips in the settlement process; that the

10

documents were "smoking guns" supporting Fidelity's case against the Stewart defendants and Fidelity is now deprived of that proof. Fidelity seeks: (a) its costs and fees in bringing the motion including costs to reopen the warehouse; (b) an instruction to the jury concerning Peloza's failure to make proper discovery disclosures; and (c) entry of a judgment against Peloza on her defenses and counterclaims against Fidelity. (Pl.'s Post-hearing Br. at 8-9.) [Dkt 445.]

Peloza argues that she did not violate the orders governing access to the warehouse because the orders did not prohibit anyone from copying documents at the warehouse. (Peloza's Resp. to Pl.'s Post-Hearing Br. at 5, 14.) [Dkt 450.] She also argues that she did not destroy the originals of the documents, only the copies. (*Id.* at 4.) She further argues that Fidelity had frequent access to the warehouse; that Peloza and the INTIC defendants did not have any responsibility to produce documents located in the warehouse; that the evidence does not show that the documents were valuable or crucial documents; and that Fidelity's delay in bringing this motion caused the inability to retrieve the originals. (*Id.* at 8-14.)[3]

The Stewart Defendants argue that no findings regarding the underlying merits of the dispute between Fidelity and the Stewart Defendants should be made based on the testimony in the hearings describing the documents. (Stewart Defendants' Submission Concerning Fidelity's Mot. to Compel.) [Dkt 449].

---

[3]Peloza's claims of "criminal battery," harassment and intimidation (Peloza's Resp. Pl.'s Post-Hearing Br. at 1-3) are not within the scope of this referral, and the Court will not consider those claims. Likewise, Fidelity's argument based on a "not so anonymous taunt-- 'you'll get nothing' (Pl.'s Post-Hearing Br. at 1) is not considered in reaching this decision.

<u>Did Peloza violate her obligations under the Federal Rules relating to discovery?</u>

Peloza initially argued that the document request Fidelity attached to its Motion for Sanctions was held by the Court to be too broad and therefore Peloza cannot be sanctioned based on that document request. (Tr. August 24, 2001 at 8.) Fidelity was given leave to supplement its motion with the appropriate document request, which it did, attaching to its Second Supplemental Brief [dkt #398] the document request served on Peloza and the other INTIC defendants in December 1999, which is discussed above. From the descriptions given by Peloza, Lourie and Sklarsky, the documents copied by Peloza and shown to Lourie and Sklarsky were within the scope of those requests. Peloza's post-hearing Response does not argue that they were not. Rather, Peloza argues that the documents were in the warehouse, and that the parties never operated under the assumption that she was obligated to produce documents in the warehouse. (Peloza's Resp. Pl.'s Post-Hearing Br. at 10-12.)

This Court initially was concerned about the suggestion that selected important documents had been concealed and held separately from the documents in the warehouse that were made available to Fidelity and the other parties. If that were the case, very severe sanctions would be warranted. However, there is no evidence to support that conclusion. Although only Peloza has testified as to where she located the originals, she testified in detail about her search and copying at the warehouse, and both Lourie and Sklarsky testified that she told them that she pulled the originals at the warehouse.

The documents at the warehouse were made available to the parties including Fidelity, subject to the orders described above. A party producing documents does not have an obligation

to put a red flag over certain documents that it knows the other party would find useful. However, a party responding to a document request does have certain obligations under the Federal Rules.

Rule 34 requires a party to produce documents "in the possession, custody or control of the party upon whom the request is served. . . ." That Rule further requires that "[a] party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories of the request."

The evidence in the hearings demonstrated that Peloza's response to Fidelity's document request was improperly evasive.[4]  For example, Fidelity's Request 2 sought:

> All documents referring or relating to Stewart's relationship with Intercounty, including those concerning Stewart's agreements with Intercounty, Stewart's ownership of Intercounty, and the termination of their or its relationship with Intercounty.

(Pl.'s Second Supp. Br., Ex. B at 3.) "Intercounty" was broadly defined as:

> Intercounty National Title Insurance Company, Intercounty Title Company, Intercounty Title Company of Illinois (subsequently known as Wholesale Real Estate Services), or INTIC Holding Company; their affiliates, subsidiaries, divisions, predecessors, successors and assigns; their present and former officers, directors, employees, agents, accountants, auditors and attorneys; and all other persons acting or purporting to act on their behalf.

(*Id.* Ex. B at 1.) Peloza, Cornell and the INTIC defendants served the following response:

> Defendants object to this Request on the grounds that there was never any relationship between Stewart and Defendant Intercounty National Title Insurance Company. Defendants further state that documents responding to this Request may be contained in the Warehouse and Plaintiff is referred thereto.

(*Id.*, Ex. C at 2.)

---

[4]Rule 37(a)(3) provides: "For purposes of this subdivision an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."

The evidence at the hearings established that Peloza– a present or former officer or director of many of the entities collectively described as "Intercounty"– knew much more than that there "may" be documents responding to that request contained in the Warehouse. She knew that such documents *were* contained in the warehouse, because Alan Hurwick had told her so, and she knew which boxes were likely to contain such documents. The same conclusion could be drawn about Peloza's responses to the other categories of Fidelity's requests that covered the documents she copied for Lourie and Sklarsky.

Peloza does not actually argue that she did not have "possession, custody or control" over the documents in the warehouse. (*See* Peloza's Resp. to Pl.'s Post-Hearing Br. at 10.) Such an argument would be futile because there can hardly be greater proof of "possession, custody or control" than the ability to access at will and search through the documents personally and unaccompanied, as Peloza did here. *See, e.g., McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 78 (D.C.D.C. 1999)(defendant's control over property supported by fact that defendant's expert was able to access property).

Instead, Peloza cites that portion of Rule 34, quoted above, which allows a party to produce documents as kept in the usual course of business or organized or labeled to correspond with the categories of the request. (Peloza's Resp. to Pl.'s Post-Hearing Br. at 10.) Peloza's own description

of the "very chaotic" mess at the warehouse graphically demonstrated that the documents located there were not "produced" in either of the formats permitted by Rule 34. [5]

Peloza further argues that Fidelity and its expert had frequent access to the warehouse and that the parties never operated under an assumption that the documents were in the possession or control of Peloza or the INTIC defendants. In support of the latter argument, Peloza cites only her own counsel's letter dated April 30, 2001 stating that the INTIC defendants' supplemental production does not include documents in the warehouse. (Peloza's Resp. Pl.'s Post-Hearing Br., Ex. E.) Putting aside the fact that there is no explanation of the context of this "supplemental" production, her counsel's letter cannot exempt Peloza from her obligations under the discovery rules. Peloza's testimony demonstrated that the information Hurwick had given her, which was not disclosed to the other parties, was critical to her ability to locate the documents on a particular topic when she wanted to find them.

The 1980 amendments to Rule 34 were intended to address a perceived problem that parties were hiding documents by inserting them in volumes of unresponsive or uninteresting materials. Charles Alan Wright, Arthur R. Miller and Richard L.Marcus, *8A Federal Practice and Procedure: Civil 2d* §2213 at 429 (1994). In *Rothman v. Emory University*, 123 F. 3d 446, 455 (7th Cir. 1997), the court of appeals affirmed sanctions entered by the district court where, in response to an order to produce requested documents, the plaintiff produced three large banker boxes that included

---

[5]Peloza's Response (at 10) quotes a portion of the transcript from the hearing of August 24, 2001, in which the Court commented that a party does not have to pull out specific documents the producing party thinks might be a "red flag" and point out these documents to the opposing party, provided the producing party has produced its documents as they were kept in the ordinary course of business. (Tr. Aug. 24, 2001 at 34-35.) However, the Court made this observation before Peloza testified about the actual condition of the warehouse.

numerous unrelated, non-responsive materials, "rebuff[ing] his obligation to sort through the documents and produce only those responsive to Emory's request."

*Govas v. Chalmers*, 965 F.2d 298 (7th Cir. 1992) is also instructive here. In that case, the Seventh Circuit affirmed the district court's decision to dismiss the plaintiffs' complaint alleging securities fraud as a sanction for the plaintiffs' discovery violations. In previous responses to discovery, the plaintiffs had indicated they had relatively few responsive documents in their possession and control. *Id* at 301. After the district court had entered an order and a monetary sanction, the plaintiffs turned over a "morass" of 9,000 unlabeled documents. *Id.* The district court found that this production failed to provide critical information about which documents the plaintiffs relied on in making their stock purchase. While Peloza's actions are not as egregious as the plaintiffs' in *Govas,* that case and the other authorities cited suggest that Peloza's failure to disclose the information that she actually possessed about the location of requested documents in the warehouse rebuts her argument that Fidelity had adequate access to the documents located there.

Furthermore, once Peloza made the copies, she had documents responsive to the document requests literally in her hand. Her argument that she had no obligation to produce the copies because the originals had been "produced" previously in the warehouse is inconsistent with her position that the parties understood that Peloza and the INTIC defendants were not "producing" the documents located in the warehouse. In any event, once she had the documents in her hands, her previous response that she had "none" of the documents and that they "may" be located at the warehouse was materially incomplete. *See* F. R. Civ. P. 26(e)(2). Had she complied with the orders governing access to the warehouse, her obligation to supplement her discovery response would have been

16

discharged by the circulation of the log required by those orders, but, as described below, Peloza intentionally circumvented the orders.

<u>Did Peloza violate the orders governing access to the warehouse and copying of documents?</u>

Peloza argues that she did not violate the two court orders relating to the warehouse because she did her copying there and did not remove originals. That argument is frivolous. If any other party had done what Peloza did, the INTIC defendants would be seeking sanctions against that party.

As noted above, the orders require that a log be made and circulated of all documents from the warehouse that are copied by or on behalf of any party, so that other parties may object that the document contains "privileged or otherwise objectionable information." (Agreed Order at 1, ¶ 3.) The argument that this requirement does not apply if the copies are made at the warehouse is not worthy of discussion. As discussed above, Peloza intentionally copied the documents at the warehouse to avoid disclosing them to the other parties. (Tr. Sept. 26 at 59, quoted above.)

Peloza's Response does not attempt to justify her bringing her personal fax/copy machine into the warehouse to make copies when the order expressly prohibits party representatives from bringing even briefcases into the warehouse. (Agreed Order at 2 ¶ 4.).)

Peloza argues that she is a "layperson and without the advice of counsel." (Peloza Resp. Pl.'s Post-Hearing Br. at 14.). Peloza is a personally named party to this lawsuit. For many years she held responsible positions as a director or officer of entities that had control over millions of dollars of other peoples' money. Peloza was then represented by counsel in this litigation, and had been. Her counsel in this lawsuit was not dealing directly with Thomas at that time, but there was no reason why Peloza could not consult her counsel about the implications of locating the documents and the

propriety of entering into a warehouse and making copies when she knew that access and copying were governed by court orders.

This Court finds that Peloza violated the orders governing access to the warehouse and copying of documents located there. Significantly, Peloza's violation did not harm only Fidelity, the movant here. It also hurt the Stewart Defendants. Some or all of the documents Peloza located were described as relating to the Stewart Defendants. Had a log been prepared and circulated, those defendants might have interposed objections to the use of those documents. Now they have had to deal with the suggestion that there is evidence of their culpability without being able to see, object to or possibly refute the documents allegedly supporting the suggestion.

### What sanctions are appropriate for Peloza's violation?

The Seventh Circuit has stated that sanctions under Rule 37 must be proportionate to the violation. *See, e.g., Crown Life Ins. Co. v. Craig*, 995 F. 2d 1376, 1382 (7th Cir. 1993).

Fidelity argues that because of Peloza's actions it has lost valuable evidence in its case against the Stewart defendants. However, it is not contended that anyone on behalf of the Stewart Defendants had any role in Peloza's discovery violations. The Court cannot impose a sanction that would effectively punish the Stewart Defendants for Peloza's violation. Furthermore, it is not clear that the evidence in these hearings would justify any finding of fact about what the documents would show. The testimony by Lourie and Sklarsky was about their recollection of documents they saw for a few minutes and their memory of how they described those documents to Thomas. They viewed the documents solely for the purpose of tempting Fidelity to proceed further with settlement

negotiations. It was clearly in their client's interest for Lourie and Sklarsky to describe those documents in the light most helpful to Fidelity.

There also is the issue of why Fidelity waited until August to make its demand for the documents. Thomas heard the description of the documents in May. Presumably if they had been as critical as now contended, Fidelity would have demanded them or at least insisted on a return trip to the warehouse. Fidelity argues that its hands were tied by the confidentiality agreement surrounding the settlement talks until fortuitously released by Peloza's counsel's questioning about the settlement negotiations at Lourie's deposition. That argument and the purported agreement, to the extent it goes beyond Fed. R. Evid. 408, do not make sense. This is not a criminal case in which there is virtually no discovery. This is civil litigation where parties have the right to the full scope of discovery provided by the Federal Rules. If Fidelity did consider itself bound not to seek the documents from Peloza if it did not enter into the settlement, then it is stuck with the consequences of its agreement, which is that the documents that could presumably have been obtained in June could not be located in October.

For all of those reasons, neither of the two substantive sanctions sought by Fidelity -- an instruction to the jury regarding Peloza's discovery responses or judgment against her on Fidelity's claims and on her counterclaims -- is proportionate to the violation. However, it is clear that Peloza's failure to comply with her discovery obligations and the orders governing access to the warehouse created the circumstances that generated this motion, which required multiple hearings. Her failure to comply was not substantially justified. Therefore, pursuant to F.R. Civ. P. 37(a)(4)(A), Peloza shall pay the reasonable expenses incurred by Fidelity in making the motion, including the expenses relating to the evidentiary hearings and the reopening of the warehouse.

The parties shall follow the procedures set out in Northern District of Illinois Local Rule 54(d), (e) and (f) regarding determination of the fees and costs to be paid by Peloza to Fidelity.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

Dated: February 6, 2002