# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5658 | **DATE** | 3/7/2002 |
| **CASE TITLE** | Fidelity vs. Intercounty | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation recommending that Plaintiff's Motion for Sanctions Against Terry Cornell for Perjury, Defamation and Interference with Judicial Process [ 376-1] be GRANTED IN PART AND DENIED IN PART is hereby submitted to Hon. Suzanne B. Conlon. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. Lorentzen v. Anderson Pest Control, 64 F.3d 327, 330 (7th Cir. 1995). _Geraldine Soat Brown_

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| ✓ | Copy to judge/magistrate judge. |

number of notices

MAR 08 2012
date docketed

docketing deputy initials

3/7/2002
date mailed notices

**Document Number**

518

tw — courtroom deputy's initials

U.S. DISTRICT COURT
CLERK

02 MAR -7 PM 4:09

FILED-ED-10

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FIDELITY NATIONAL TITLE )
INSURANCE COMPANY OF NEW YORK, )
     Plaintiff, )     Cause No. 00 C 5658
          )
     v. )     Judge Suzanne B. Conlon
          )     Magistrate Judge Geraldine Soat Brown
INTERCOUNTY NATIONAL TITLE )
INSURANCE COMPANY, et al., )
     Defendants. )
          )

**DOCKETED**
**MAR 0 8 2002**

To:   The Honorable Suzanne B. Conlon
       United States District Court Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

      The District Judge has referred Plaintiff's Motion for Sanctions Against Terry Cornell for

Perjury, Defamation and Interference with the Judicial Process ("Fidelity's Mot. against Cornell")

[Dkt # 376] to the Magistrate Judge for Order or Report and Recommendation. [Dkt # 365.] For

the following reasons, this Court respectfully recommends that the Motion be GRANTED in part

and DENIED in part as follows: 1.) That Fidelity's motion to have Myron Cherry disqualified from

representing any party in this case be denied; 2.) That defendant-counterplaintiff Terry Cornell's

counterclaim against Fidelity and Cornell's third-party complaint against Thomas Simonton be

dismissed with prejudice; 3.) That the jury be informed that the Court has previously found that

Cornell improperly attempted to interfere with Simonton's relationship with Fidelity and the counsel

representing both Simonton and Fidelity, and that the Court also found that Cornell lied under oath

1

in denying that he sent anonymous communications to Simonton for that purpose; 4.) That Cornell be required to pay to Fidelity the costs and expenses that Fidelity incurred in bringing this motion, including Fidelity's expert witness fees and reasonable attorneys' fees; and 5.) That this matter be again referred to the U.S. Attorney for such investigation and action as he deems appropriate.

## FACTUAL BACKGROUND

The lawsuit.

This lawsuit involves claims by plaintiff Fidelity National Title Insurance Company of New York ("Fidelity") for millions of dollars in damages that Fidelity alleges were looted from the escrow deposits of a title insurer, Intercounty Title Company, and that Fidelity was required to make whole to the escrow claimants and beneficiaries. Fidelity alleges that Terry Cornell and Susan Peloza and companies that Cornell and Peloza controlled knowingly participated in the alleged looting scheme. Cornell and Peloza deny any wrongdoing and have filed a counterclaim against Fidelity and a third-party complaint against Fidelity National Financial, Inc. and Thomas E. Simonton. Simonton is a senior vice-president of plaintiff Fidelity. (Ans., Aff. Defenses, Counter-Cmpl. and Cross-Cmpl. of Intercounty National Title Co, Intercounty Title Co., INTIC Holding Co., Peloza and Cornell [Dkt ## 112, 113, 114] at 73.) The cross-complaint by Cornell and others against Simonton alleges, *inter alia*, that, as things began to unravel at Intercounty in early 2000, Cornell and Peloza advised Simonton and urged him to take action, but he never did so. (*Id.* at 79.)

The anonymous letters.

In January, 2001, the District Judge referred to this Court Fidelity's Emergency Motion to Compel and Supplement to Emergency Motion to Compel. [Dkt # 101.] The subject of that motion

2

was certain anonymous cards and letters received by Fidelity's counsel and other persons working for or associated with Fidelity. Many of the cards and letters were crude, vulgar and threatening. Fidelity sought various orders, including compelling expedited discovery, and a protective order. This Court held a hearing with counsel for all parties, including Cornell. (Tr. Jan. 9, 2001.) Fidelity was ordered to file the letters under seal and the matter was referred to the U.S. Attorney for investigation. (Minute Order, Jan. 9, 2001 [Dkt #72].) Fidelity sought expedited discovery directed to both the circumstances of the letters themselves and the subjects discussed in the letters. (Tr. Jan. 9, 2001 at 6-7.) That request was denied because the issue of the sending of the letters had been referred to the U.S. Attorney, and there was no reason to expedite discovery on the substantive issues in the lawsuit because of anonymous letters. (*Id.* at 7-9.) Fidelity also asked for a protective order prohibiting any correspondence between the defendants and plaintiffs. That was denied without prejudice because this Court believed that referral to the U.S. Attorney would be more effective to deter someone who was sending anonymous letters, which by virtue of their anonymity suggest a disregard for proper behavior. (*Id.* at 11.) Cornell's counsel stated on the record, "We have definitely checked with our clients on this, and absolutely been assured that they had nothing to do with this. And we wanted to make sure that that was crystal clear for this Court." (*Id.* at 12.)

In light of that representation, this Court believed that, having expressed the Court's extreme disapproval of the sending of anonymous letters and having referred the matter to the U. S. Attorney, the disgusting practice of sending anonymous letters would come to an end. (*Id.* at 14-15, 32.)

That belief was incorrect. An anonymous memorandum was sent to Simonton less than a

week after the January 9, 2001 hearing. (Pl.'s Ex. 14.)[1] Additional anonymous letters were directed to and apparently received by persons associated with Fidelity, including Edwin Thomas, who is an attorney of record for Fidelity and for Simonton, and William Pollard, an accountant with Deloitte & Touche who has testified as an expert witness for Fidelity in this lawsuit. (Pl.'s Mot. against Cornell, Ex. G.)[2]

Fidelity's motion against Cornell.

On August 16, 2001, Fidelity filed the present motion, alleging that DNA testing had established that Cornell was the sender of an anonymous, threatening letter received by Thomas on February 8, 2001 (Pl. Ex. 18), and, by implication, that Cornell was responsible for the other such letters. The motion alleged that DNA extracted from the glue sealing the subject letter matched DNA extracted from cups from which Cornell had drunk at his deposition. The motion asked that Cornell be sanctioned for sending the letter and for testifying at his deposition that he did not send it. The motion also alleged that Cornell and his counsel had schemed to interfere with the attorney-client relationship between Simonton and Thomas, counsel for Fidelity and Simonton, as evidenced by an e-mail admittedly sent by Cornell to Simonton. The e-mail to Simonton included an e-mail that Cornell had sent on January 18, 2001 to Alexander Lourie, an attorney not of record in this case

---

[1] Except as noted, exhibit numbers reflect the exhibits marked at the evidentiary hearings held on December 3, and 4, 2001 and January 7, 2002. Some of those exhibits had previously been marked as deposition exhibits. The consecutively numbered transcript pages for the evidentiary hearings are cited as "R. ___."

[2] In accordance with the January 9, 2001 Order, Fidelity filed the exhibits containing the anonymous letters under seal. Although Simonton did not testify at the hearings, apparently it is not disputed that Pl.'s Ex. 14, a memorandum addressed to Simonton and Pl.'s Ex. 15, a letter addressed to him, were received by Simonton.

who had previously represented some of Cornell's and Peloza's interests. *See* Memorandum

Opinion and Order, February 6, 2002 at 4. [Dkt # 512.] In that e-mail, Cornell stated, in part:

"Pursuant to Mike Cherry's insistance [sic], Sue [Peloza] and I told Tom Simonton that Ed Thomas

was not his friend." (Pl.'s Ex. 17.)[3] Myron "Mike" Cherry is one of Cornell's counsel of record in

---

[3] The undisputed e-mail sequence in Pl.'s Ex. 17 is as follows. On January 18, 2001, at 2:15 p.m., Cornell sent the following e-mail to Lourie:

Hey Sandy,

We need your help. Pursuant to Mike Cherry's insistance [sic], Sue and I told Tom Simonton that Ed Thomas was not his friend. I also asked him why would he wants [sic] Thomas representing him when he (Thomas) isn't going to look out for his (Tom's) best interests.

Simonton said that you are the only lawyer that he trusts in this who he trusts [sic] in this whole mess. Simonton said that he wanted to know if was [sic] ok to talk to you. We said that we have no problem with him talking to you.

We told Simonton that Ed Thomas said that he thought that Simonton was in this with Capriotti. When we were talking in the Spring, Thomas told you not to deal with Simonton. Thomas also said that Simonton was going to get fired. Tom says that this goes along with everything he's heard and just wants to hear it from someone. If he calls you, please talk to him. If you [sic] firm wants to represent him, go for it.

(he's looking for a lawyer)

TC

At 6:50 p. m. that day, Lourie sent the following response to Cornell:

Terry,

I am out for another week.

Also, I cannot talk to him, because I still want to be able to say I represent you guys in order to maintain attorney client privilege on stuff we talk about. I therefore would have an ethical problem talking to him (just like Mike), and while I am sure everything is ok, I do not want to get caught in a trap that could screw that up or give something for Ed to take me to the ARDC about since Tom technically is still represented by Ed.

Having said that, however, I have no problem confirming to you that Ed told me that Tom was in deep trouble and that Fidelity thought that he was acting on his own. He also told me that he wondered whether Tom was on the take from somewhere.

If you have any other questions, please feel free to contact me via e-mail or phone and I will try to respond ASAP. However, I think it is not good for you or for me to be talking to Tom.

Sandy

Those two e-mail messages were sent by Cornell to Simonton, also on January 18, 2001.

5

this case. Fidelity's motion asked that Cherry be disqualified from representing any party in this lawsuit.

Cornell's response.

In his response to Fidelity's motion, Cornell submitted an affidavit reiterating and reaffirming his deposition testimony that he did not write or send the February 8, 2001 letter to Thomas and does not know who wrote and sent it to Thomas. (Cornell's Resp., Ex. B, ¶2.) Cornell's affidavit also stated that Steven Simon and Thomas Reynolds, investigators hired by Fidelity who were part of the chain of custody of the subject letter and cups, had "followed, harassed, threatened and spied on" Cornell and Peloza.[4] In support of this statement, Cornell attached a police report prepared by Palos Park Police regarding an incident on January 21, 2001. (*Id.* at ¶4-5.) (That police report is discussed further below.) In his affidavit, Cornell admitted that he sent the January 18, 2001 e-mail to Simonton, including both his message to Lourie and Lourie's response, although his affidavit states that he only intended to send the response from Lourie and not his (Cornell's) message to Lourie. Cornell's affidavit states, in part:

> Simonton told me that he wanted to hear certain things that Thomas had told Alexander "Sandy" Lourie as well as to others. Simonton asked me if there was any way to prove these conversations, so I gave him a copy of the e-mail that Sandy Lourie sent to me in which Mr. Lourie stated that: "I have no problem confirming to you. . . ." . . . However, I never intended to send to Simonton the e-mail I sent to Mr. Lourie, an attorney, on January 18, 2001. . . .

(*Id.* at ¶11.)

---

[4] Thomas Reynolds was retained by Fidelity in January 2001 to do investigative work, including finding out who was sending the anonymous letters. (R. 107-08, 113.) He subcontracted parts of his assignment to Steven Simon and Peter Wacks. (R. 108.)

<u>Discovery for the hearings.</u>

In his Response, Cornell also requested discovery to prepare for the evidentiary hearings on the motion. This Court granted Cornell's request and, in the absence of any federal rule more specifically on point, ordered Fidelity to produce the information that Illinois Supreme Court Rule 417 requires be produced by the proponent of DNA evidence in criminal cases. (Minute Order, August 31, 2001 [Dkt # 394].) Fidelity's DNA testing laboratory was ordered to send the subject cups and envelope directly to a testing service to be designated by Cornell's counsel. (Minute Order, September 19, 2001 [Dkt # 422].) Cornell was ordered to produce the same documentation with respect to any DNA testing that he had performed. (Minute Order, October 29, 2001 [Dkt # 444].)

Cornell was also permitted to take the deposition of the three investigators for Fidelity who were in the chain of custody of the letter and the cups and who were expected to testify at the hearing. The depositions were limited to one and one-half hours each on the subject of the chain of custody. Those depositions were held in the Court's jury room. (Minute Order, September 14, 2001 [Dkt # 415].)

<u>Cornell's Emergency Omnibus Motion [etc.].</u>

Less than a week before the scheduled hearings, Cornell filed the INTIC Defendants' Emergency Omnibus Motion [etc.] [Dkt # 458] asking the District Judge, *inter alia*, to stay the hearings on the grounds that this Court refused to hear evidence demonstrating that Fidelity's investigators were harassing and attempting to intimidate Cornell and Peloza. The District Judge referred that motion to this Court. This Court denied Cornell's motion and refused to permit evidence of the alleged harassment into the hearings on Fidelity's motion, both because evidence

about the allegations would not significantly advance a material issue in these proceedings and also because the materials submitted by Cornell entirely failed to support his allegations of harassment. In fact, they supported the opposite conclusion, that Cornell fabricated allegations of criminal conduct which, upon investigation by the Palos Park police, were found to be baseless.

The police report attached by Cornell as an exhibit to his Response relates that on January 21, 2001, a police officer was dispatched to an address in Palos Park where Cornell and Peloza live.[5] The officer heard a male subject (identified as Cornell) yelling, using profanities and threatening bodily harm to another unknown subject (identified as Jeffrey Hall of Simon Investigations). Two additional officers arrived to find a black Lincoln Navigator (identified as Cornell's car) blocking a tan Toyota (Hall's car). Cornell accused Hall of being near his (Cornell's) front door with a camera and a screw driver trying to break into Cornell's home. Cornell stated that Hall tried to pry open the front door with a screw driver. The police officers reported that there were no visible pry marks or signs of damage to the door. The officers also checked all three other sides of the house and found no signs of foot prints. Also, there were no signs of recent foot prints in the snow in the area where Cornell had told the officers that he had chased Hall down the street. The officers were unable to find any screwdriver or pry tool in the area or in Hall's car (which they apparently searched). Hall told the officers that Cornell had taken his camera. The police report quotes Cornell as telling the police officers "several times" that he threw Hall's camera into the snow. After a brief search, the officers found Hall's camera in Cornell's car. The report continues:

> Mr. Cornell repeatedly verbally abused and threatened assisting officers that he was going to cause problems with the neighborhood due to our reluctance to file criminal charges against Mr. Hall. Mr. Cornell stated he was awaiting a phone call from the

---

[5] Cornell and Peloza have lived at that Palos Park address for at least seven years. (R. 510.)

> States Attorney and he would go door to door in the morning to assemble the
> neighbors against the police department. Mr. Cornell also stated he was filing a law
> suit in the morning and stated that he knew the law since he was a law student. Mr.
> Cornell further stated he was going to file a complaint with the mayor and the police
> chief in the A.M.

(Cornell's Resp., Ex B, Ex. 2 at 2.)

This is material that *Cornell* submitted to support his allegations that he and Peloza were being harassed and intimidated by Fidelity's investigators. Cornell also attached as an exhibit to his Response a complaint filed in 1998 in the Circuit Court of Cook County against several Chicago police officers and investigator Reynolds, as well as the City of Chicago, by a person unrelated to this litigation arising out of a incident involving divorce proceedings. (Cornell's Resp., Ex. B., Ex. 3.) None of Cornell's materials indicated the outcome of that lawsuit or why this Court should consider an unverified complaint in an unrelated matter as having any bearing on Reynold's credibility in these hearings. The INTIC Defendants' Emergency Omnibus Motion added a claim that on October 22, 2001 Peloza was forced off the street while walking by a car driven by a man she now knows was Reynolds. The motion stated that Peloza was knocked over and injured her hand, and that she has reported the incident to the Palos Park police. (INTIC Defs.' Emer. Mot. at 6.) The motion did not state whether the police have investigated the incident or any results.

The materials submitted by Cornell not only failed to establish his claim of harassment, they effectively undermined it. They provided no basis for spending time and effort in depositions or hearings on Cornell's claim of harassment. The fact that Wacks, Reynolds and Simons are investigators retained by Fidelity is not disputed. To the extent that retention affects their credibility as witnesses, there was no need to present additional evidence.

9

The hearings.

Scheduling of the hearings was delayed because of problems Fidelity had producing the documents ordered. Ultimately, evidentiary hearings were held on December 3 and 4, 2001 and January 7, 2002. Fidelity called as witnesses regarding the chain of custody several attorneys from the firm of Lord, Bissell and Brook (Fidelity's counsel) and investigators Peter Wacks, Steven Simon and Thomas Reynolds. Fidelity also called Cornell as an adverse witness. As its witness regarding the DNA testing, Fidelity presented Jami Harman, Scientific Director of Genetic Testing, Inc.

Cornell's counsel called Cornell and Peloza as witnesses, and presented as Cornell's witness on DNA testing Howard Coleman of Genelex Laboratories, Inc. After Cornell testified that Genelex Laboratories had taken a sample of his blood and run a DNA test, Cornell was ordered to produce the results of that test and Genelex Laboratories was ordered to produce the same documents as to that test that Fidelity had been ordered to produce based on Illinois Supreme Court Rule 217. (Minute Order, December 4, 2001 [Dkt # 476].)

Ultimately, Cornell stipulated that the DNA profile generated by Genelex Laboratories from Cornell's blood was the same as the DNA profile generated by Genetic Technologies, Inc. from the sample taken from the cups. (R. 166.) Following the hearings, the parties submitted post-hearing briefs.

## LEGAL STANDARD

The sanctions that Fidelity seeks are the entry of judgment against Cornell on his counterclaim against Fidelity and his third-party complaint against Simonton, attorneys' fees and costs, and the disqualification of Cherry from representing any party in this lawsuit. (Pl.'s Mot. at 1.)

Although Fidelity argues that a preponderance of the evidence standard may be used, citing *Quela v. Payco-General American Credits, Inc.,* No. 99 C 1904, 2000 WL 799750, *4 (N.D. Ill., May 17, 2000)(Castillo, J.), because the sanctions that Fidelity seeks have a punitive as well as remedial element, the standard of "clear and convincing evidence" is more appropriate. *See, e.g., Danis v. USN Communications, Inc.,* No. 98 C 7482, 2000 WL 1694325, *34 (N.D. Ill., Oct. 23, 2000)(Schenkier, M.J.). In addition, a finding of contempt of court requires clear and convincing evidence, even though the purpose of the sanction imposed for the civil contempt may be remedial. *Stotler & Co. v. Able,* 870 F.2d 1158,1163 (7th Cir.1989); *U.S. v. Dowell,* 257 F.3d 694, 699 (7th Cir. 2001.)

The Seventh Circuit's discussion of proof in *U.S. v. Ytem,* 255 F.3d 394 (7th Cir. 2001), is also instructive here. The defendant in that criminal case argued that there could not be proof beyond a reasonable doubt because there was no direct evidence of the defendant's having mailed certain checks with embezzled funds and the defendant denied doing so. The Seventh Circuit stated that the defendant's position bespoke "a deep or perhaps desperate misunderstanding of the law of evidence." *Id.* at 395.

> He admits that certainty is not required to establish guilt beyond a reasonable doubt. . . . But he insists that a conviction can survive remote doubts about its correctness only when it is based on computed probabilities; common sense probabilities will not do. That is wrong. Common sense as well as science is a source of justified true beliefs, including warranted confidence that certain probabilities though unquantified are so slight that they do not create reasonable doubt. Often this confidence is formed by comparing hypotheses and sensibly adjudging one to be vastly more probable than the others, even when taken all together.

*Id.* at 396.

With those standards in mind, the following findings of fact are made.

# FINDINGS OF FACT

<u>Cornell's attempt to influence Simonton.</u>

At Cornell's deposition taken on July 18, 2001, an anonymous, undated letter to Simonton was marked as Exhibit 484. That letter stated, in part:

> Dear Tom:
>
> I really hope that you and your family really have a nice holiday. . . . [Y]ou have to put yourself in our shoes. The tide has turned in our favor. *We have both gotten jobs* and will continue to fight Fidelity as they have wronged us. But let me tell you something. *Fidelity is not your friend.* As a matter of fact, they blamed this mess on you and Larry Capriotti. . . *Be careful of Ed Thomas.* He has told several attorneys that they were going to fire you, but your [sic] saved for now because of the lawsuit. I know that you may not believe me and if you want, *call me. . .*
>
> In regards to your deposition on January 10th. Please tell the truth. . . . We will be at the deposition. . . . *Thomas is setting you up for the fall.* . . . Remember we still are friends, contrary to what you think or have heard. . . . *Thomas, all he cares about is running up fees.*
>
> *Please call.*

(Emphasis added.) The letter was marked at the hearings as Pl.'s Ex. 15.

An anonymous memorandum to Simonton dated January 15, 2001 was marked as Exhibit 483 at Cornell's deposition. That memorandum stated, in part:

> Tom,
>
> As per our discussion, here is the information that I promised you:
>
> 1. Ed Thomas told Sandy Lourie that we should not work with you, as you were part of the Larry Capriotti scheme. In addition, you were going to be fired.
>
> 2. Ed Thomas called Ed Genson and said that with the Intercounty lawsuit just gave Simonton job insurance until the lawsuit was over.

The memorandum also listed the telephone number of Alexander Lourie. That memorandum was

marked at the hearings as Pl.'s Ex.14.

At his deposition and at the hearings, Cornell denied under oath that he wrote or sent either the January 15, 2001 memorandum or the undated letter. (Pl.'s Ex. 19 at 455-56; R.140-41, 143-44.)[6] However, as discussed above, Cornell has admitted sending to Simonton the e-mail exchange between himself and Lourie (Pl.'s Ex. 17, quoted in footnote 3, above). At his deposition Cornell was asked, "Is what you told Sandy Lourie in that e-mail the truth?" He answered, "Yes." (Pl.'s Ex. 19 at 461-62.) Fidelity argues that this testimony and the text of the e-mail ["Pursuant to Mike Cherry's insistance [sic], Sue and I told Tom Simonton that Ed Thomas was not his friend."] are proof that Cherry instigated an improper effort to interfere with Fidelity's client and witness. In his affidavit, Cornell denied that he contacted Simonton at Cherry's insistence. (Resp., Ex. B, ¶9-10.)

In his testimony at the hearings, Cornell was extremely evasive. For example, under questioning from his counsel he testified that he did not call Simonton at the direction of his attorneys (R.154, 513); under questioning from Fidelity's counsel, Cornell said that he did not remember Cherry insisting that Cornell and Simonton talk. (R. 156.) When asked specifically regarding the statement in the e-mail, "Pursuant to Mike Cherry's insistance [sic]," Cornell said, "I don't remember. ... I don't think so. . .." (Id.) When asked why he wrote that statement in the e-mail, Cornell testified that he didn't recall, probably so Lourie would hurry. (Id.) When asked whether it was now his testimony that what he wrote in the e-mail to Lourie was not true and that Cherry had not directed him to contact Simonton, Cornell stated, "Correct." But when asked whether he said something to Lourie that was not true, Cornell answered, "I don't know. I don't know how to answer that. I might have used that to push Mr. Lourie a little quicker. He's a little

---

[6] Excerpts from Cornell's deposition were admitted as Pl.'s Ex. 19.

slow to respond sometimes. I don't know." (R. 156-57.)

The factual question, then, is whether Cornell was lying to Lourie when he wrote that he called Simonton at Cherry's insistence, or whether he was lying in his testimony when he said that Cherry had not directed him to call. Using a standard of clear and convincing evidence, the Court cannot find that the evidence establishes that Cherry instigated Cornell's contacts with Simonton. Cornell may have told Lourie that he and Peloza acted on Cherry's insistence in order to justify their contacting Simonton.

Regarding Cornell's conduct, however, this Court finds that clear and convincing evidence establishes both that Cornell lied under oath when he testified at his deposition and in the hearings that he did not send the anonymous letter and memorandum to Simonton and did not know who sent them; and that Cornell improperly attempted to interfere with Simonton's relationship with his counsel, and improperly attempted to influence a witness.

Seen in the light of Cornell's January 18, 2001 e-mail to Lourie, the conclusion that Cornell was responsible for the anonymous letter and January 15, 2001 memorandum to Simonton is inescapable. What Cornell relates to Lourie that he (Cornell) and Peloza told Simonton is virtually verbatim the text of the anonymous letter and memorandum. The text of the anonymous letter also states "We have both gotten jobs," consistent with Peloza and Cornell as the source. The sequence of the communications further reinforces the conclusion. The anonymous letter expresses hope that Simonton and his family have a nice holiday, and refers to Simonton's upcoming deposition scheduled for January 10, [2001], thus suggesting a date in December 2000 or early January 2001. That letter refers to Thomas' having told several attorneys that Simonton was going to be fired, and asks Simonton if he does not believe it to "call me. . . . Please call." The memorandum, dated

January 15, 2001, states, "As per our discussion, here is the information that I promised you: Ed Thomas told Sandy Lourie that we should not work with you, as you were a part of the Larry Capriotti scheme. In addition, you were going to be fired." It also includes Lourie's telephone number. (Pl.'s Ex. 14.) Three days later, on January 18, 2001, Cornell sent the e-mail to Lourie in which Cornell describes himself and Peloza telling Simonton statements that are virtually identical to the letter and memorandum, and telling Lourie that Simonton wants to know if it is all right for Simonton to talk with Lourie.

At his deposition and hearing, Cornell attempted to absolve himself of interfering with Simonton's relationship with Fidelity and Thomas by testifying that Simonton called him. Cornell testified at his deposition that he sent the e-mail exchange because:

> Tom Simonton called me, and he was–he was mad at Ed Thomas. He said Ed Thomas was going to hang him out to dry, and he wanted to get another lawyer and he wanted–*he wanted to hear certain things the Ed had told Sandy*, Sandy Lourie, as well as other lawyers. And he asked me if there was any way, you know, to kind of prove it. So I gave him the e-mail.

(Pl.'s Ex. 19 at 462, emphasis added.) Assuming, *arguendo*, that Cornell's account was truthful, such a call by Simonton would be consistent with Cornell's having previously sent the anonymous letter in which the author reports that Thomas has been saying bad things about Simonton and pleads, "call me. . . . Please call." Why would Simonton call Cornell, who is suing Simonton personally, for proof that these statements were made by Thomas unless Cornell was the one who told Simonton about them in the first instance?

Furthermore, if Simonton had initiated the exchange with Cornell, Cornell would have every reason to say so in his e-mail to Lourie, instead of stating that Cherry insisted that Peloza and Cornell talk to Simonton.

Cornell was advised by Lourie that Lourie "would have an ethical problem talking to [Simonton]" and that "it is not good for you or for me to be talking to Tom [Simonton]." (Pl. Ex. 17.) However, Cornell admits that, notwithstanding this advice, he intentionally forwarded Lourie's e-mail to Simonton, thus knowingly attempting to circumvent the ethical prohibitions precluding Lourie from communicating with Simonton.

Cornell's intention to interfere with Simonton's relationships with Fidelity and with the attorney who is representing both Simonton and Fidelity is clear from the content of his communications.

Accordingly, this Court finds that Cornell lied under oath when he testified at his deposition and in the hearings that he did not send the anonymous letter and January 15, 2001 memorandum to Simonton and did not know who sent them. The Court further finds that Cornell improperly attempted to interfere with Simonton's relationship with his counsel and improperly attempted to influence Simonton, an adverse party and witness whom Cornell knew to be represented by counsel.

The February 8, 2001 letter to Thomas.

On February 8, 2001, a letter addressed to Thomas arrived at the offices of Lord Bissell & Brook, Fidelity's counsel in this case. (R. 23.) Because Thomas was out of the office, attorney Andrew Fowerbaugh reviewed Thomas' mail. (*Id.*) He noted that the envelope bore the same postmark as other anonymous letters Thomas had received. Fowerbaugh held the letter up to the light and saw some wording in the letter that led him to believe that it might be another of the anonymous letters. Fowerbaugh put the letter inside a large manila envelope and locked it in his desk. He called investigator Reynolds to pick it up, and the following day, Wacks came to Fowerbaugh's office and Fowerbaugh gave the letter in the envelope to Wacks. (R. 23-24.)

16

Fowerbaugh had not opened the letter. (R. 25-26.)

Wacks testified that he is a former FBI agent and licensed private investigator working with Reynolds for Fidelity, providing liaison with the FBI and doing investigative work regarding Intercounty. (R. 27, 36-37.) Wacks received the manila envelope from Fowerbaugh on February 9, 2001, noted Fowerbaugh's name and the date on the manila envelope but did not open the manila envelope. (R. 28, 30.) He turned the unopened manila envelope over to Steven Simon on February 12, 2001. (*Id.*)

Simon testified that he is a licensed private investigator. (R. 49-50.) On February 12, 2001, he received a sealed manila envelope from Wacks. (R. 51.) Simon took the manila envelope to his home. (*Id.*) Wearing rubber gloves, Simon opened the manila envelope and took out the envelope addressed to Thomas. Simon split that envelope along the top and removed the letter. He did not disturb the glued portion of the envelope. (R. 51-52.)[7] He testified that he opened the envelope because it was questionable, bearing no return address, and he thought it might be associated with this case. (R. 72-73.) He placed the envelope addressed to Thomas and the letter in separate plastic bags, put the bags into white envelopes and locked them in a file cabinet in his office. (R. 53.) The following day he handed the white envelopes to Reynolds at Reynolds' office. (*Id.*) Reynolds testified that he kept the envelopes locked in his file cabinet until they were retrieved by Simon in April, 2001. (R. 109.)

---

[7] Apparently Simon had testified at his deposition that the letter had already been opened when he received it, but at the hearings he testified that that deposition testimony was a mistake. (R. 52.)

The idea of testing the envelope for DNA came up in April 2001.[8] (R. 53-54.) Simon retrieved the envelope from Reynolds in early April 2001. (R. 54.) The materials were in the same condition in which he had given them to Reynolds, with the envelopes unopened. (R. 55.) Simon reopened the white envelopes, and sent the envelope addressed to Thomas to a DNA testing laboratory, Genetic Technologies, Inc. near St. Louis, Missouri, by Federal Express on April 18, 2001. (R. 54-56; Pl.'s Ex. 13.) He testified that the rear flap was still glued shut when he sent the envelope to the testing laboratory. (R. 106.) The original of the letter that was in the envelope addressed to Thomas is still in Simon's office, but he made a copy for Fidelity's counsel. That letter was admitted as Def.'s Ex. 1, Ex. H, p. 1 (R. 96), and also Pl.'s Ex. 18.

The letter (herein "the February Letter") is crude and obscene. It threatens Thomas and his law firm with lawsuits and claims that he is being or will be investigated by the FBI and indicted for obstruction of justice. The February Letter begins "Dear Ed: You can hand this over to the federal authorities, too!" That is an obvious reference to the Court's earlier Order referring the issue of the anonymous letters to the U. S. Attorney.

At his deposition and in the hearings, Cornell denied under oath either writing or sending the February Letter or knowing who did. (R. 133; Pl.'s Ex. 19 at 467.)

The cups.

Cornell's deposition was taken on July 18, 2001 at the Lord, Bissell & Brook offices. Plastic cups were available at a refreshment table. (R. 127.) During the deposition, Cornell used three cups.

---

[8] Apparently Wacks testified at his deposition that he thought that the idea of DNA testing was why the letter had been turned over to the investigators in February, but he testified at the hearings that he would defer to Simon if Simon said the idea arose in April. (R. 38.)

(R. 126.) Thomas retrieved the cups that Cornell used, grabbing them by the base, and taking them to his office. (R. 125.) Simon placed the cups in separate plastic bags, handling them with tweezers. (R. 59.) He put the plastic bags in white envelopes and sent them to Genetic Technologies, Inc. the following day, July 19, 2001. (R. 60-61.)

Stipulation regarding *U.S. v. Trala*.

In order to save time on background facts, this Court suggested, and the parties agreed to, a stipulation that the description of DNA and DNA testing procedures set out in part II of the opinion in *U.S v. Trala*, 162 F. Supp. 2d 336, 339-344 (D. Del. 2001), is assumed to be correct for these proceedings. (R. 175.) Several concepts from that opinion are important for this discussion.

> A gene is a particular DNA sequence located along a chromosome. . . . The position that gene occupies along the DNA thread is know as its locus. . . .
>
> [O]ver 99% of human DNA does not vary from person to person. Each person's DNA, however, has certain regions where the rungs of the ladder will be different.
>
> . . . The possible arrangements of base pairs that could occur in one of these polymorphic areas (i.e., the alternative forms of a gene that an individual could possess) are know as alleles. . . . The individual genetic makeup described by the alleles is known as the genotype. In forensic analysis, the genotype for a group of analyzed loci is called the DNA profile. When a sample of DNA is typed, the lab examiner looks at predetermined polymorphic loci, identifies the alleles that make up the DNA sequence at those polymorphic loci, and then determines how likely it is for this sequence to appear in a given population.
>
> . . . . .
>
> The data generated is analyzed by an accompanying computer software program which determines the size of the alleles based on the rate at which they reach the window. . . . The software detects the light being emitted and converts it into peaks of different sizes. The analyst then compares the configuration of these peaks against know reference standards in order to determine the number of alleles present at the target loci in a given sample. The signal must be of a certain strength, that is, the peak be must be high enough to be interpreted before the FBI laboratory will have enough confidence in the data to make an interpretation.

162 F. Supp. 2d at 340-42.

<u>Testing done by Genetic Technologies, Inc. for Fidelity.</u>

Jami K. Harman, the scientific director for Genetic Technologies, Inc. ("GTI") testified for Fidelity about the testing done by GTI on the envelope and the cups. Her curriculum vitae was admitted as Pl.'s Ex. 5-C. Prior to her employment with GTI, Harman was employed for thirteen years as a forensic scientist for the St. Louis County, Missouri Crime Laboratory with duties including analyzing DNA evidence from crime scenes, preparing reports and testifying as an expert witness. (R. 179-80; Pl.'s Ex. 5-C.)

GTI's evidence receipt record (Pl's Ex. 7) shows that two items were received by GTI from Simon on April 20, 2001: an envelope addressed to "Fidelity National Title, Ronald Maudsley" which GTI called "Q1," and a white letter sized envelope addressed to "Ed Thomas, Lord Bissell & Brook" which GTI called "Q2." A number of items were received by GTI from Simon on July 20, 2001: Three clear plastic cups, called "Q3," "Q4," and "Q5," and six plastic bags each containing one paper towel.[9] When Q2 arrived, the sealed portion of the envelope was sealed and intact. (R. 197.) DNA was extracted from the adhesive that was exposed by lifting the seal. (R. 197-98.) The DNA could have come from saliva or from fingers handling the envelope. (R. 198.)[10] The sample of DNA that GTI was able to extract was sufficient to get firm results for the alleles at six loci, and to prepare a partial profile. (R. 198.) The analysis of Q1 and Q2 was done in May 2001, before the

---

[9] Simon had also collected and sent to GTI paper towels used by Cornell at his deposition (R. 97); however, no DNA test results were reported from the towels.

[10] Cornell testified that he is severely allergic to glue, and does not lick envelopes but rather uses a sponge. (R. 514-15.) He presented no medical evidence on this point, although Peloza testified that she has seen Cornell have allergic reactions to duct tape and the wood in a golf tee, and that shortly before the hearings Cornell licked an envelope and had a bad reaction requiring the use of a Benadryl inhaler. (R. 520-21.) Because the source of the DNA could have come from handling as well as saliva, whether Cornell's testimony regarding his allergy is true or not is irrelevant.

cups were shipped. (R. 274, 348, 360-61; Pl's Ex. 1D (worksheets dated 5-9 and 5-10-01).)[11]

GTI also performed analysis of the DNA on the cups in August 2001. The results of GTI's testing are set out in the following:

Pl.'s Ex. 2 consists of computer printouts of the plots for the allelic ladders for Q3, Q4, Q5 and Q2;

Pl.'s Ex. 1A is a Forensic Report dated August 8, 2001;

Pl.'s Ex. 1B is a Supplemental Revised Report dated August 30, 2001; and

Pl.'s Ex. 1C is a Supplemental Revised Report dated August 30, 2001.

Harman executed an affidavit on August 31, 2001 (Pl.'s Ex. 6) stating that the reason for preparing the first supplemental report was that on the August 8, 2001 report the allele at locus D21S11 for Q2 was reported incorrectly as "13" when it was in fact "30" as shown on the allelic ladder. Actually, the affidavit itself was incorrect, because the error in reporting locus D21S11 as "13" instead of "30" was in the report for Q4 and Q5. (R. 308-310.) In fact, the allelic ladder plot for the locus D21S11 shows "30" for all three samples, Q2, Q4 and Q5. (Pl.'s Ex. 2.)

The results are most clearly set out in Pl.'s Ex. 1B. That exhibit shows the items tested, the results of the tests and the conclusions. Page 3 of that exhibit shows a summary of Observed Alleles. GTI concluded that the samples on Q1 and Q2 (the envelopes) were male in origin, but not consistent with each other. The samples from Q4 and Q5, two of the cups, were consistent with each other and with Q2, the envelope in which the February Letter was sent. (Pl.'s Ex. 1B at 3.)[12] Harman testified

---

[11] The original envelopes and cups were marked as Def.'s Exs. 24, 25, 27, 29 and 31.

[12] GTI reported that no genetic profile was obtained from Q3, one of the cups. (Pl.'s Ex. 1B at 2.)

to her conclusion, within a reasonable degree of scientific certainty, that the DNA on the envelope and the cups came from the same source. (R. 199-200.) GTI concluded that the genetic profile on Q4 and Q5 is expected to occur in approximately 2 in 551 billion in the Caucasian population and 1 in 182 trillion in the African American population. (Pl.'s Ex. 1B at 3; R. 313.) In the Supplemental Revised Report #2, GTI concluded that the partial genetic profile obtained from Q2 is expected to occur in 1 in 346 million in the Caucasian population . (Pl.'s Ex. 1C at 2; R. 315.) GTI does not usually prepare profile statistics on partial genetic profiles such as obtained from Q2; here, they prepared the statistics at the client's request. (R. 313.)[13]

Cornell's genetic testing and expert witness.

Cornell called as his expert witness Howard C. Coleman, the CEO of Genelex Corporation ("Genelex"), a forensic and paternity DNA testing laboratory in Redmond, Washington. (R. 432.) After Cornell testified that Genelex had tested a sample of his blood, Cornell's counsel stipulated that Cornell's genetic profile matched that reported by GTI for Q4 and Q5. (R. 166.) Although the cups and envelope tested by GTI were sent to Genelex pursuant to an order of September 19, 2001 [Dkt # 422], apparently Genelex did no testing on the envelope or the cups.

Cornell's attack on GTI's results.

Instead of providing evidence of a different genetic profile for Q2, Cornell attacked the

---

[13] The genetic profile for the DNA sample from Q1 is completely different from the other four profiles. (Pl.'s Ex. 1B at 3.) Q1 is a greeting card-sized envelope sent to Ronald Maudsley in December 2000. (Def.'s Ex. 24.) Unlike Q2 (the envelope for the February Letter), there was no evidence about the chain of custody of Q1 and it appears that Q1 was opened originally at the seal instead of being slit at the top as Q2 was. Thus, the gummed portion of the envelope could have been handled by other persons besides the original sender.

reliability of the results obtained by GTI. This attack focused on two areas: first, GTI's documentation and procedures; and second, the conclusions drawn by Harman based on the small concentration of DNA found on the envelope glue.

Cornell attacked the sufficiency of the documentation that GTI produced in response to the Court's Orders. For example, the August 31, 2001 Order, tracking the language of Illinois Supreme Court Rule 417, required Fidelity to produce "proficiency testing results" for examiners, testers or analysts involved in the testing in this case. GTI provided the most recent of those tests for Harman and another GTI employee, Stephanie Chandler. (R. 213; Pl.'s Ex. 5.) Harman testified that she had taken forensic tests twice a year for the three years that she has been at GTI and had taken others during the time that she worked for the St. Louis Crime Laboratory, as well as three proficiency tests for paternity testing each year for the past three years. (R. 210-12.) Cornell's counsel objected that GTI had not produced the results for "each and every" proficiency test Harman ever took. (R. 217.) However, in light of the nature of this proceeding, and the other evidence of Harman's professional qualifications, this Court finds that Harman's interpretation of the Order to require the results of the most recent forensic proficiency test (which is what is relevant to these hearings) was reasonable.[14] Harman testified that she passed the proficiency test (R. 218), and Cornell did not present evidence to the contrary.

Coleman was critical of the quality and quantity of the documentation produced by GTI, for example, GTI's procedures manuals. He testified that at Genelex such documentation occupies an entire bookshelf. (R. 450-56.) He criticized the lack of worksheets between the computer results

---

[14] No opinion is expressed as to whether more extensive document production would be required in a criminal case.

and the final report, and the typographical errors in the reports. (R. 459-60.) He also criticized the fact that Robert Allen, the technical director of GTI, did not sign the reports although Harman testified that Allen had reviewed the reports. (R. 316, 460.) Coleman concluded that this evidenced sloppy and hastily performed procedures that were not adequately reviewed.

A major focus of Cornell's attack on GTI's results was the issue of the "relative fluorescence unit" ("RFU") levels of the alleles that GTI included in creating its genetic profile of Q2. The RFU level reflects the concentration or strength of the DNA. (R. 244.) As discussed in the opinion in *U.S. v. Trala,* above, "The signal must be of a certain strength, that is, the peak be must be high enough to be interpreted before the FBI laboratory will have enough confidence in the data to make an interpretation." 162 F. Supp. 2d at 342. These "peaks" show the RFU of the tested DNA sample. The RFU levels and the alleles generated by a DNA sample are plotted by the computer program without intervening human analysis. (R. 245; 503-04.) Interpretation comes in when the analyst looking at the plot so generated decides which alleles reflected on the plot are sufficiently reliable to be included in the profile. Coleman testified that there has been a lot of debate regarding the setting of RFU levels because there is a danger of overinterpreting the data if the analyst uses data based on an RFU level that is too low to be reliable. (R. 469.) On the other hand, the development of more sophisticated equipment and processes permits interpretation of DNA from smaller, more "degraded" samples such as those associated with crime scenes, and not just the more concentrated samples from a known source, like the blood sample taken from Cornell. *See U.S. v. Trala*, 162 F. Supp. 2d at 341 ("[T]he PCR process enables the analysis of very tiny amounts of DNA. PCR also

permits the analysis of old and/or degraded DNA samples.").[15] The DNA sample from the envelope was a low concentration. (R. 500-01.)

The computer-generated plot for Q2 is set out in Pl.'s Ex. 2, and GTI's genetic profile based on that plot is set out in Pl.'s Ex. 1B and 1C. GTI included alleles with RFU frequencies as low as 41. (R. 389.) Harman testified that the GTI standard level is 75, and the Q2 profile reflects that a number of the alleles "called" (i.e., reported) are below GTI's standard threshold of 75. (R. 265.)

The reliability of reporting results from low concentration DNA is a complex issue because there is no single accepted standard. As both Harman and Coleman testified, different laboratories have different standards, and it is even acceptable for a laboratory to deviate from its own standard threshold levels if the laboratory has adequate validation for doing so. (R. 277, 471, 481.) There is also the issue of the purpose of the allele call. For example, the FBI uses a standard of 200 for inclusion, but a lower standard for exclusion. (R. 262.) In other words, if on the tested item an allele with an RFU below 200 was inconsistent with the suspect's allele at that locus, the allele called at the lower RFU would still be used by the FBI to exclude the suspect as the source of the DNA.

Harman testified that the GTI standard of 75 and the decision to include in the Q2 profile alleles with RFU levels below 75 were based on a number of criteria. First, she testified that GTI had done validation studies to support allele calls based on extremely low levels of DNA. (R. 265-67, 275.) In addition, RFU levels below 75 are not automatically disregarded; each sample is reviewed independently. (R. 270, 277.) In the analysis of Q2, some alleles at levels below 75 were disregarded and some were not. (R. 270-71.) For example, she felt confident making the allele call

---

[15] Polymerase chain reaction ("PCR") amplification was the process used by GTI here. (R. 185.)

at locus FGA based on an RFU of 41 because "the base line was clean" with no evidence of artifacts or spikes appearing. (R. 275.) She testified that the manual issued by the manufacturer of the equipment used in this case, Perkin Elmer, uses a threshold of 150, but in the time since the issuance of the manual, the Perkin Elmer representatives have done seminars and workshops supporting interpretations made down to 40 or 50 RFU. (R. 279-80.) She denied that the reason GTI used RFU values below 75 was because Fidelity's counsel requested GTI to do so. (R. 274.) Significantly, nothing in the computer plots generated by GTI's computer for Q2 is inconsistent with Cornell's admitted profile in Q4 and Q5. (R. 386.)

Because of the potential significance of the issue of the reliability of GTI's allele calls below 75 RFU, this Court ordered Harman to reappear at a continued hearing in the case and to produce to Cornell's counsel the data underlying the validation studies of RFU levels below 75, and to identify the cases in which her testimony was accepted regarding DNA with RFU levels below 75. (Minute Order of December 4, 2001 [Dkt # 476].)

When the continued hearing resumed, Harman testified to validation studies done by GTI in May and June 1998 to validate allele calls below 75 using GTI's equipment, the Applied Biosystems 310 Genetic Analyzer from Perkin Elmer. (R. 377- 85, 411, 421, 427.) Harman also testified that the materials provided by Genelex, Cornell's expert's laboratory, showed that Genelex sets its RFU threshold at 25 to 40. (R. 393.) She also identified two cases in which her testimony based on RFU levels below 75 had been admitted. In *Iowa v. Belken*, FECR 011693 (Ia. Dist. Ct. 1999), *aff'd as mod.*, No. 103/99-2001 (Ia. 2001).[16] Harman testified on behalf of the prosecution, and RFU levels

---

[16] In that case the Iowa Supreme Court rejected the defendant's challenge to Harman's qualifications to testify as an expert.

as low as 61 were "part of the case." (R. 375-76.) Cornell's counsel pointed out in cross-examination that in Harman's deposition in that case, Harman had stated that her conclusions were based on allele calls at RFU levels no lower than 150. (R. 403-04.) Harman stated that since the time that deposition was taken, GTI had changed its threshold to 75 (although no additional validation studies were done), and her testimony at trial included data at RFU levels below 150. (R. 400-01.) She also testified that in *Missouri v. Villasana*, No. 398-CF-227x (Mo. 2001), she had testified for the defense based on RFU levels as low as 39. (R. 376.)

Coleman testified that, in his opinion, GTI's results were not reliable and the result of the testing of Q2 should be "inconclusive." (R. 493.) In addition to the lack of documentation discussed above, he was critical of the data submitted by GTI to support its use of RFU values below the manufacturer's recommendation of 150. He acknowledged that a laboratory may properly go below the manufacturer's recommended threshold; however, in his opinion, GTI's validation studies did not justify GTI's doing so. (R. 500.) He also acknowledged that Genelex uses a threshold of 40 (R. 496), but he stated that Genelex uses a different machine, the Hitachi FMB10. (R. 470.) Hitachi does not recommend a particular threshold. (R. 507.) Genelex' decision to use a threshold of 40 is based on "a consensus from user groups" "developed in conjunction with the manufacturer and supported by validation studies." (R. 508.) He admitted that Genelex has been a "Hitachi PowerPlex shop" and he is less familiar with the ABI 310 equipment used by GTI. (R. 498.)

This Court concludes that Coleman's criticisms of GTI's documentation and procedures go to the weight rather than the admissibility of Harman's conclusions. In considering this issue, it is also significant that Coleman does not personally prepare any DNA profiles or do case work, and he has never taken any proficiency tests in DNA analysis. (R. 433, 508.) The bulk of Genelex' work

is in paternity testing (R. 433) not forensic testing. It is also significant that Cornell stipulated, and Coleman admitted, that the genetic profile prepared by GTI from Q4 and Q5, the cups, was the same as that generated by Coleman's laboratory from a direct sample of Cornell's blood. (R. 503.) Although the concentration of DNA and the resultant RFU level were much higher on the cups than on the envelope, the fact that there is no discrepancy in the results obtained by the laboratories cuts against the argument that GTI's procedures generate inaccurate or unreliable results.

The issue is, what do the results generated by GTI mean for this case using the standard of proof appropriate in this case. The fact is that all of the results obtained by GTI are consistent with Cornell as the source of the DNA on the envelope. Coleman admitted that none of the results generated by GTI, not even considering the results at the lowest RFU level, excluded Cornell. (R. 502.) At some loci the concentration was too small to register an allele, but Harman testified that to exclude the DNA source from the envelope as being a match with the DNA on the cups, she would expect to see an allele in conflict with the known sample, the cups, and she did not. (R. 354.) The fact that the results obtained by GTI on Q1, the letter addressed to Roger Maudsley, reflect a completely different genetic profile also confirms this conclusion, as well as reinforcing the fact that GTI's testing procedures were not structured in order to reach a conclusion desired by Fidelity.

The Court finds that GTI's results and Harman's conclusion are sufficiently reliable to be considered as part of the evidence on the issue of whether Cornell is the source of the February Letter. DNA evidence is not the only evidence before this Court on this issue. There are also the following facts, which have been admitted or found by this Court: Cornell admitted that he lied to Lourie by saying that Cherry insisted he and Peloza contact Simonton. Cornell admitted that he sent Lourie's e-mail to Simonton after Lourie advised him it would be an ethical problem for Lourie to

communicate with Simonton, and not good for Cornell to do so either. The Court has found by clear and convincing evidence that Cornell sent two anonymous written communications to Simonton, one before and one after the January 9, 2001 hearing in which Cornell's counsel assured the Court that Cornell was not the source of the anonymous letters. Apparently, Cornell lied to his counsel of record in this case, as well as to Lourie and proceeded to send the January 15, 2001 anonymous memorandum to Simonton after the Court's hearing on the issue. Finally, this Court, which had an opportunity to observe Cornell testify on two different days in the hearings and to assess his credibility, finds that Cornell has lied under oath in affidavits, depositions and on the witness stand about whether he sent those anonymous communications.

As the Seventh Circuit stated in the *Ytem* case, "Common sense as well as science is a source of justified true beliefs, including warranted confidence that certain probabilities though unquantified are so slight that they do not create reasonable doubt." 255 F.3d at 396. In this case, the standard of proof is clear and convincing evidence, not evidence beyond a reasonable doubt. Viewing the evidence as a whole, including but not limited to the DNA evidence, the Court finds that clear and convincing evidence establishes that Cornell was the source of the February Letter to Thomas, and that Cornell lied under oath at his deposition, in his affidavit and as a witness in the hearings when he denied that.

Accordingly, Court finds that clear and convincing evidence proves that Cornell:

1. Contacted Simonton, an opposing party and an important witness for Fidelity who was known by Cornell to be represented by counsel, for the purpose of interfering with Simonton's relationship with the attorney who was representing Simonton and Fidelity, and for the purpose of influencing his testimony and position in the lawsuit;

2. Sent several anonymous communications to Simonton for that purpose;

3. Sent at least one anonymous letter to Thomas, one of the attorneys for Simonton and Fidelity which letter was crude, obscene and threatening;

4. Lied under oath in affidavits, deposition testimony and the hearings before this Court when he denied sending the anonymous communications;

5. Caused his counsel to misrepresent to the Court at the January 9, 2001 hearing that Cornell had not sent any anonymous letters; and

6. Continued to send anonymous letters after the January 9, 2001 hearing at which the Court expressed its extreme disapproval of the practice and referred the matter to the U.S. Attorney.


## DISCUSSION

Fidelity's motion to disqualify attorney Cherry.

The foregoing findings of fact do not justify granting Fidelity's motion to disqualify attorney Cherry from representing any party in this lawsuit. As Cornell points out, disqualifying counsel who has represented the INTIC defendants from the beginning of this lawsuit would work a substantial hardship on those defendants, especially with the trial fast approaching. Although Cornell's testimony was evasive about why he told Lourie that he (Cornell) and Peloza communicated with Simonton "[p]ursuant to Mike Cherry's insistance [sic]," the only evidence, besides the text of the e-mail, to support Cherry's involvement is Cornell's answer at his deposition that what he told Lourie was true. At the hearings, Cornell contended that his deposition answer did not refer to that part of the e-mail to Lourie. Further, Cornell admitted that he disregarded the advice of attorney Lourie that Lourie could not ethically communicate with Simonton and that Cornell should not

either. That Cornell would lie to his attorney Lourie in order to avoid admitting that he (Cornell) instigated the contacts with Simonton is entirely consistent with the pattern of Cornell's behavior disclosed by the evidence. Thus, Fidelity's claim that Cherry instigated Cornell's contacts with Simonton has not been proven by clear and convincing evidence, and, therefore, this Court respectfully recommends that Fidelity's motion to disqualify Cherry be denied.

Fidelity's motion against Cornell.

A number of principles guide consideration of how to deal with Cornell's improper actions, which the Court has found proven by clear and convincing evidence.

In addition to the sanctions provided in the Federal Rules of Civil Procedure, a federal court has inherent power to impose sanctions for conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Further, "[a]lthough the language of Rule 37 requires violation of a judicial order in order to impose sanctions, a formal, written order to comply with discovery is not required. Courts can broadly interpret what constitutes an order for purposes of imposing sanctions." *Quela v. Payco-General American Credits, Inc.*, No. 99 C 1904, 2000 WL 799750, at *6 (N.D. Ill. May 17, 2000)(Castillo, J.).

> [A]n order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system. Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37.

*Id.*

Accordingly, there is no need for a formal court order commanding a witness testifying under oath to tell the truth; the witness is independently obligated to do so by the force of his own oath and

the perjury statute, 18 U.S.C. §1621. *Murray v. Northeast Illinois Regional Commuter RR. Corp.*, No. 98 C 1734, 2000 WL 26374, at *3 (N.D. Ill. Feb. 28, 2000)(Guzman, J.).

Lying under oath is intolerable and can be punished by the Court through sanctions as well as through a prosecution for perjury. "Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system." *Quela*, 2000 WL 799750, at *7, citing authority including *Rodriguez v. M&M /Mars*, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997)(Gettleman, J.)("Parties who wish to use the judicial system to settle disputes have certain obligations and responsibilities. One of those responsibilities is to tell the truth. . . .").

In determining appropriate sanctions for lying under oath and other improper activity in litigation, courts have considered the degree of wilfulness or the intentional nature of the conduct, and the extent to which there is a pattern of misconduct. Jonathon M. Stern, *Untangling a Tangled Web Without Trial: Using the Court's Inherent Powers and Rules to Deny a Perjuring Litigant his Day in Court*, 66 J.Air L. & Com. 1251, 1286-87 (2000)(collecting cases).[17] Also relevant is the materiality of the misconduct to the proceedings. *Id.* at 1288. "Most courts will find the misconduct material if it had the capacity to influence the litigation. Actual influence is usually unnecessary because '[t]he failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct.'" *Id.*, quoting *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 1120 (1st Cir. 1989). In this case all three of those factors–wilfulness or intent, pattern, and materiality–suggest that severe sanctions are appropriate here.

Contrary to Cornell's argument (Post-hearing Brief at 6), the matters about which he has lied

---

[17] Cornell attached a copy of this article to his Post-Hearing Brief.

under oath are not immaterial to the lawsuit. Cornell's improper communications to Simonton were patently intended to disrupt the relationship between Simonton and his counsel and to influence Simonton's role as a party and a witness. That action in itself is extremely serious; that Cornell lied about it under oath further aggravates the offense. The Seventh Circuit discussed the seriousness of communicating a represented party or witness in *Weibrecht v. Southern Illinois Transfer, Inc.*, 241 F.3d 875 (7th Cir. 2001). In that case, the Seventh Circuit reversed a dismissal of the plaintiff's claim where the plaintiff's counsel had contacted a represented party as "too harsh a response to what appears to have been an honest but misguided attempt to comply with the ethical rules." *Id.* at 883. However, the Court remanded with instructions that the district court conduct additional proceedings to determine the nature of the communications because:

> if Shane [the plaintiff] or McGlynn [the lawyer] (or both) attempted to influence a witness's testimony, rather than merely to interview Bader [the witness] to learn what information he had about the accident, that conduct would be a serious infraction that could have warranted a dismissal with prejudice.

*Id.* at 884.

In the present case, Cornell's contacts with Simonton cannot be characterized as "honest but misguided." Lourie specifically warned Cornell that what Cornell wanted–for Lourie to confirm to Simonton that Thomas had said bad things about Simonton–could not happen because it would be an ethical problem. (Pl.'s Ex. 18.) Lourie also advised Cornell that he (Cornell) should not be communicating with Simonton, either. (*Id.*) Yet, in spite of this advice, Cornell intentionally forwarded Lourie's message to Simonton, achieving his goal to provide Simonton a confirmation from Lourie, notwithstanding the prohibitions of the ethical rules.

Cornell's characterization of the February Letter as "non-threatening" is simply contrary to

the text of that letter. The letter threatens Thomas with lawsuits against himself and his firm, with FBI investigations, with indictment, and refers to "illegal activities" and "Obstruction of Justice," all relating to Thomas' activities in this lawsuit. The whole objective of the letter is clearly to harass and intimidate Thomas. The second to last paragraph refers to the author's having seen Thomas at Cavanaughs (a restaurant in the Loop) and states, "If someone wanted to get you it would be easy, . . ." The suggestion is clearly that the author is watching Thomas' personal activities, and could "get" him if the author wanted to. The obvious goal is to interfere with or inhibit Thomas' actions in representing Fidelity in this lawsuit.

Again, Cornell sent this letter knowing that the series of anonymous letters had been the subject of a hearing in which the Court had expressed extreme disapproval of that activity and referred the matter to the U.S. Attorney. The first sentence of the February Letter expresses the author's contempt for the Court's order: "Dear Ed: You can hand this over to the federal authorities too!"

The record reflects that the three anonymous communications that were the subject of Cornell's testimony in these hearings (the "holiday" 2000 letter to Simonton; the January 15, 2001 memorandum to Simonton, and the February Letter to Thomas) were among a series of anonymous letters, cards and memos received by persons associated with Fidelity in this lawsuit, including William Pollard, an accountant from Deloitte & Touche who has testified as an expert witness for Fidelity. (Pl.'s Mot., Exs. A-D, G-H, K.) Because the evidence at the hearings did not deal with those other documents, the Court can not make a finding by clear and convincing evidence that Cornell wrote and sent or directed the sending of those documents, although the tone and content of the letters and memos are consistent with the anonymous communications that the evidence shows

Cornell did send. The fact that the DNA profile from the sample on the envelope addressed to Roger Maudsley did not match Cornell's profile does not eliminate the possibility that Cornell was involved with the sending of the card enclosed in that envelope; it simply fails to prove that he was involved.

Not only is there a pattern of Cornell's sending the anonymous communications, there is a pattern of Cornell's lying about them, in affidavits, deposition testimony and even in the hearings held in this Court.

Fidelity seeks an order of judgment against Cornell on his counterclaim against Fidelity and his third-party complaint against Simonton. The Seventh Circuit has stated that such a sanction is "draconian" and should be applied only after consideration of less severe sanctions. *Barnhill v. U.S.,* 11 F.3d 1360, 1367 (7th Cir.1993).

> In the normal course of events, justice is dispensed by the hearing of cases on their merits; only when the interests of justice are best served by dismissal can this harsh sanction be consonant with the role of the courts.

*Id*. Although the prejudice to the moving party is a consideration, the Seventh Circuit stated in *Barnhill*:

> We continue to eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power. In general, however, dismissal or judgment is such as serious sanction that it should not be invoked without first considering what effect–if any– the challenged conduct has had on the course of the litigation. . . . *Misconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interest of the parties immediately before the court.*

*Id*. at 1368, citations omitted, emphasis added.

This Court has carefully considered whether a lesser sanction is appropriate, and has

concluded that it is not. Cornell's attempt to drive a wedge between Simonton on one hand and Fidelity and Thomas on the other was clearly "material." It was plainly intended to influence the outcome of the lawsuit. Whether it will result in some lingering distrust that will infect Simonton's testimony in some way, however subtle, is impossible to say. Likewise, the February Letter was designed to intimidate and inhibit Thomas' (and Fidelity's) prosecution of their case. The anonymous letters certainly created concern and distraction, whether or not they had the intended result of inhibiting Fidelity's prosecution of the case. Further, as indicated by the court in the *Aoude* case, quoted above, the perpetrator of the scheme should not have the benefit of assuming that the scheme was unsuccessful.

Cornell has had the benefit of a "warning shot." The January 9, 2001 hearing, including the referral to the U.S. Attorney, could not have been clearer, yet Cornell continued to send anonymous communications, including the January 15 memorandum to Simonton, less than a week later. Cornell also brushed aside Lourie's advice not to communicate to Simonton, and the ethical problem if Lourie communicated. To use the words of the Seventh Circuit in *Barnhill,* it is rare that a party expresses its "flagrant contempt for the court and its processes" as explicitly as Cornell did in the February Letter.

In light of those facts, as well as Cornell's knowingly improper scheme to entice Simonton away from Fidelity and Thomas, Cornell should not be allowed to continue to use the judicial system for his own benefit to prosecute a claim against Simonton or Fidelity. Thus, this Court respectfully recommends that Fidelity's motion be granted insofar as it requests that Cornell's counterclaim against Fidelity and Cornell's third-party complaint against Simonton be dismissed with prejudice.

Further, in order to remedy any possible lingering effect of Cornell's attempted interference

36

of Simonton's relationship with Fidelity and Thomas, this Court recommends that the jury be informed that the Court has previously found that Cornell improperly attempted to interfere with Simonton's relationship with Fidelity and its counsel, and that the Court also found that Cornell lied under oath in denying that he sent anonymous communications to Simonton for that purpose.

This Court recommends that Cornell be required to pay the costs and expenses incurred by Fidelity in bringing this motion, including Fidelity's expert witness fees and reasonable attorneys' fees.

Finally, this Court agrees with Fidelity that this matter should be again referred to the U.S. Attorney for such investigation and action as he deems appropriate.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Plaintiff's Motion for Sanctions against Terry Cornell [etc.] be GRANTED IN PART AND DENIED IN PART as follows:

1. That Fidelity's motion to have Myron Cherry disqualified from representing any party in this case be denied;

2. That defendant-counterplaintiff Terry Cornell's counterclaim against Fidelity and Cornell's third-party complaint against Thomas Simonton be dismissed with prejudice;

3. That the jury be informed that the Court has previously found that Cornell improperly attempted to interfere with Simonton's relationship with Fidelity and the counsel representing both Simonton and Fidelity, and that the Court also found that Cornell lied under oath in denying that he sent anonymous communications to Simonton for that purpose;

4. That Cornell be required to pay to Fidelity the costs and expenses that Fidelity incurred in bringing this motion, including Fidelity's expert witness fees and reasonable attorneys' fees; and

37

5. That this matter be again referred to the U.S. Attorney for such investigation and action as he deems appropriate.

Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

**ENTER:**

**Geraldine Soat Brown**
**United States Magistrate Judge**

Dated: March 7, 2002

38