# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5658 | **DATE** | 7/3/2002 |
| **CASE TITLE** | | FIDELITY vs. INTERCOUNTY | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The INTIC defendants' motion for summary judgment [366-1] is granted in part and denied in part. Judgment is entered for defendants Intercounty National Title Insurance Co., Intercounty Title Co., INTIC Holding Co., Susan Peloza, and Terry Cornell and against plaintiff Fidelity National Title Insurance Company of New York on Count IV. The motion is denied on Counts I, II, VI, VII, and VIII. Plaintiff's motion for partial summary judgment [362-1] is denied. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | JUL 0 8 2002 | 546 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 7/3/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | | | pw | |
| CB | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 JUL -3 PM 3: 32 | mailing deputy initials | |
| | | 0 Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**JUL 0 8 2002**

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, ) ) ) ) | |
| Plaintiff, ) ) | No. 00 C 5658 |
| v. ) ) | Suzanne B. Conlon, Judge |
| INTERCOUNTY NATIONAL TITLE INSURANCE COMPANY, et al., ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Fidelity National Title Insurance Co. ("Fidelity") sues Intercounty Title Company ("New Intercounty"), Intercounty National Title Insurance Co. ("INTIC"), INTIC Holding Co. ("INTIC Holding"), Susan Peloza, and Terry Cornell (collectively, "the Intercounty defendants") for damages caused by an alleged Ponzi scheme involving real estate escrow accounts. The court dismissed Counts III, V, and IX through XII against the Intercounty defendants. *See Fidelity v. Intercounty*, 2001 WL 477162, at *1 (N.D. Ill. May 3, 2001). Fidelity has six remaining claims: fraudulent concealment (Count I), breach of fiduciary duty (Count II), breach of escrow contract (Count IV), violations of the Illinois Title Insurance Act, 215 ILCS § 155/1 *et seq.* (Count VI), unjust enrichment (Count VII), and conversion (Count VIII). The Intercounty defendants move for summary judgment. Fidelity moves for partial summary judgment to preclude the Intercounty defendants from arguing ITI Enterprises, Inc. ("ITI Enterprises") is responsible for the escrow deficiency. The Intercounty defendants' summary judgment motion is addressed first.

1

# BACKGROUND

## A. The Relevant Parties

All facts are undisputed unless otherwise noted. INTIC is a registered Illinois title insurance underwriter. INTIC began operation in 1995. New Intercounty is INTIC's title agent, and supports INTIC by providing title and closing services. INTIC Holding Co.'s sole function is to hold 100% of INTIC stock. Peloza and Cornell are the sole owners of INTIC Holding stock, and the only officers and directors of INTIC Holding, New Intercounty, and INTIC. Cornell was vice-president of Old Intercounty, and later became vice-president and secretary of INTIC and New Intercounty. He owned 49% of INTIC Holding stock. Peloza was executive vice-president, secretary, and director of Old Intercounty, president of INTIC, and vice-president of New Intercounty. She owned 51% of INTIC Holding stock. Fidelity is a national title insurance company. From 1995 to 2000, Fidelity acted as INTIC's title reinsurer. Thomas Simonton is Fidelity's senior vice-president.

Stewart Title Co., Stewart Title Guaranty Co., and Stewart Information Services Corp. (collectively "Stewart") acted as Old Intercounty's exclusive underwriter until 1995. Between 1984 and 1995, Old Intercounty was Stewart's exclusive title and escrow agent. ITI Enterprises provided staffing and services for INTIC and New Intercounty. Laurence W. Capriotti was president and director of Old Intercounty and president of ITI Enterprises. He owned 40% of Old Intercounty's stock. During Peloza's tenure as an Old Intercounty officer and director, she reported to Capriotti. Jack L. Hargrove was Old Intercounty's executive vice-president and chairman of the board of directors. Hargrove and Capriotti jointly owned ITI Enterprises.

## B. Old Intercounty and Stewart

Stewart was Old Intercounty's title insurance underwriter until 1995. From 1986 to 1989, Old Intercounty reported escrow shortages as a current liability on its audited and reviewed financial statements. In February 1995, Old Intercounty and Stewart entered into a memorandum of understanding. The agreement noted Old Intercounty's escrow account was deficient by $6 million. Old Intercounty agreed to balance the account by November 15, 1995. In April 1995, Stewart entered into a restructuring agreement with Old Intercounty. The agreement stated the escrow deficiency did not exceed $4 million. Stewart and Old Intercounty's relationship ended in late 1995.

## C. Fidelity and the Intercounty Defendants

INTIC and New Intercounty were formed in 1995. On September 14, 1995, INTIC and Fidelity entered into a reinsurance agreement. Under that agreement, INTIC acted as the title insurer and Fidelity provided title reinsurance. Fidelity insured risks under INTIC's title insurance policies beyond a designated retention amount. INTIC paid premiums to Fidelity for reinsurance coverage. Fidelity and INTIC issued joint closing protection letters. INTIC paid Fidelity an additional premium for the closing letters.

At the same time, ITI Enterprises, New Intercounty, and INTIC entered into a joint agreement. ITI Enterprises leased office space and equipment to New Intercounty and INTIC. ITI Enterprises performed title searches, closing services, and escrow management for New Intercounty. New Intercounty performed title searches, title examinations, issued INTIC title insurance policies, and conducted real estate closings. INTIC, INTIC Holding, and New Intercounty were located in the same Chicago office. In October 1995, INTIC informed the Illinois Department of Financial Institutions that it had staffed its accounting, legal, and claims departments, under a contract with

ITI Enterprises. In addition, INTIC informed the department it would contract with Old Intercounty's former employees until it could retain its own employees.

An underwriting agreement between INTIC and New Intercounty provided that New Intercounty "agrees to keep safely in escrow account . . . all funds received by [New Intercounty] in connection with transactions in which [INTIC's] title insurance policies will be issued." Pl. 56.1 Facts, Ex. 91 at ¶ 3G. INTIC was required to obtain regulatory approval from the Illinois Department of Financial Institutions to underwrite title insurance. The Fidelity-INTIC reinsurance agreement provided the security necessary for INTIC to obtain the department's approval. INTIC and New Intercounty began operations in November 1995. All disbursements for New Intercounty's real estate closings were made from the New Intercounty escrow account. New Intercounty and INTIC's revenues came from the escrow accounts. ITI Enterprises paid Peloza and Cornell for consulting services.

**D.     The Escrow Shortage**

By 1998, Peloza and Cornell had borrowed $642,902 from INTIC. They obtained these funds by writing checks to themselves. INTIC's financial statements reflected these personal withdrawals as loans. A portion of the funds were used to make improvements on Peloza's residence. Peloza and Cornell used INTIC funds to pay personal expenses, such as hospital bills. They used $50,000 for personal investments in Touhy Investments, L.L.C. They paid interest on these loans by claiming $10,500 each in director fees, and signing their fee checks over to INTIC.

In 1999, INTIC's balance sheet reflected $761,298.56 in advances to Cornell and Peloza. Peloza and Cornell concede they did not repay the loans to INTIC, but contend they made an

$800,000 loan to INTIC in 1995. Pl. 56.1 Facts, Ex. 50. Peloza and Cornell did not execute written loan agreements for INTIC funds. By May 17, 2000, they had borrowed $928,000 from INTIC.

A similar scenario occurred with the New Intercounty account. By 1999, Peloza had borrowed $375,000 from New Intercounty's checking account. By May 2000, Peloza and Cornell had borrowed $429,000 from New Intercounty. Peloza and Cornell did not repay these loans to New Intercounty. They used $50,000 of New Intercounty funds for personal investments in 1031 Rush Limited Partnership. Cornell used $22,000 of New Intercounty funds to pay his personal federal and Illinois income taxes. Thomas Davey, INTIC's accountant, advised Peloza and Cornell to repay personal loans because he believed Fidelity would be "very concerned when the audit comes out and reveals these balances." Def. 56.1 Facts at ¶ 26.

On April 23, 1999, LaSalle Bank informed Peloza that New Intercounty's escrow accounts were continually overdrawn. LaSalle Bank threatened to terminate the banking relationship. LaSalle Bank sent a similar letter to Capriotti on June 10, 1999; a copy was sent to Peloza. Peloza claims she did not receive these letters. In January 2000, Robert Martos, New Intercounty's president, informed Peloza and Cornell that Harris Bank wanted to terminate its relationship with New Intercounty because the escrow account had insufficient funds for disbursements. The escrow accounts were under New Intercounty's name.

On March 24, 2000, Fidelity extended the Fidelity-INTIC reinsurance agreement for five years. At the same time, Fidelity conducted an investigation into the escrow accounts. A month later, Fidelity discovered a deficit of over $40 million. The next day, Fidelity advised the Intercounty defendants it was terminating the reinsurance agreement. The Illinois Department of Financial Institutions issued a cease and desist order to the Intercounty defendants. Two days later, Fidelity

reconsidered and revoked its termination of the reinsurance agreement. As a result, the Illinois Department of Financial Institutions lifted the cease and desist order. On May 11, 2000, Fidelity senior vice-president Simonton wrote to title agents assuring them that "Fidelity stands behinds [sic] its obligations to [INTIC] and as a result, your clients whose policies were reinsured by Fidelity have the security unmatched by any other title insurer." Def. 56.1 Facts at ¶ 35.

Fidelity retained Deloitte and Touche, an accounting firm, in May 2000 to investigate the Intercounty escrow shortages. Preliminary findings uncovered an escrow shortage between $46 and $55 million. On June 22, 2000, Fidelity cancelled its reinsurance agreement with INTIC. The Illinois Department of Financial Institutions issued another cease and desist order. Hundreds of New Intercounty's customers and lenders received checks that failed to clear. The Illinois Department of Financial Institutions appointed Fidelity to act as trustee of New Intercounty with authority to assure proper disbursement of all escrow funds held by New Intercounty or its agents. Fidelity contends the Intercounty defendants engaged in a Ponzi scheme for 10 years, commingling funds and using incoming funds to cover prior debts.

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). A movant may satisfy its initial burden by demonstrating there is an absence of evidence to support the non-movant's claims. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). Once a moving party has met its burden, the

nonmoving party must go beyond the pleadings and present specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## II.    Fraudulent Concealment [Count I]

To establish fraudulent concealment, Fidelity must demonstrate: (1) the Intercounty defendants concealed a material fact; (2) concealment was intended to induce false belief under circumstances creating a duty to speak; (3) Fidelity could not have discovered the truth through reasonable inquiry or inspection; (4) Fidelity would have acted differently had it been aware of the information; and (5) Fidelity's reliance on the omitted fact led to its injury. *Ruane v. Amore*, 287 Ill. App. 3d 465, 476, 67 N.E.2d 1369, 1377 (1st Dist. 1997). Passive silence is sufficient to trigger the fraudulent concealment doctrine where the parties are in a continuing fiduciary relationship. *Pitts v. Unarco Indus., Inc.*, 712 F.2d 276, 279 (7th Cir. 1983); *Illinois Central Gulf Road Co. v. Dept. of Local Govt. Affairs*, 169 Ill. App. 3d 683, 685, 523 N.E.2d 1048, 1049 (1st Dist. 1988). Fidelity asserts fraudulent concealment in its own capacity and as subrogee and assignee of the escrow payees.

### A.    Actual Knowledge

To succeed on a fraudulent concealment claim, Fidelity must demonstrate the Intercounty defendants had knowledge of the escrow deficiency before Fidelity discovered the shortage in

February 2000. *See TRW Title Ins. Co. v. Security Union Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998). Peloza and Cornell were the only officers of New Intercounty, INTIC, and INTIC Holding. They deny knowledge of escrow deficiencies before February 2000. Def. 56.1 Facts at ¶¶ 40, 41. They deny responsibility for escrow shortages in the New Intercounty escrow accounts. *Id.*, Ex. A-1, A-2. Instead, they blame ITI Enterprises for escrow mismanagement and missing funds. *Id.* at ¶¶ 20, 23, 24.

In response, Fidelity argues that Peloza and Cornell knew about and were actively involved in the creation of escrow deficiencies before February 2000. Peloza was Old Intercounty's vice-president. She was privy to financial information about Old Intercounty's escrow shortages from late 1980s to mid-1990s. *See* Pl. 56.1 Facts at ¶ 30. From 1986 to 1989, Old Intercounty's audited and reviewed statements noted file overdrafts or escrow shortages. *Id.* Fidelity offers evidence Peloza attended an Old Intercounty shareholder meeting in 1989 where a one million dollar escrow shortage was reported. *Id.*, Ex. 40. It is undisputed Peloza knew of a $4 million to $6 million escrow shortage in 1995. *Id.* at ¶ 37. Although these events occurred before the Fidelity-INTIC relationship, pre-1995 knowledge supports a reasonable inference Peloza knew there was a continuing problem with the escrow accounts. INTIC was created to replace Stewart, and Fidelity was recruited as its reinsurer. INTIC and New Intercounty's staff was primarily composed of Old Intercounty employees. These facts suggest INTIC and New Intercounty were continuations of Old Intercounty. Peloza's pre-1995 knowledge of escrow shortages is probative evidence of her awareness of continuing escrow problems.

Fidelity points to evidence raising a genuine factual dispute as to whether Peloza had knowledge of escrow problems after September 1995. Fidelity offers a 1999 letter from LaSalle

Bank addressed to Peloza that states New Intercounty's escrow account was overdrawn. Pl. 56.1 Facts at ¶ 59. LaSalle Bank demanded that Peloza provide adequate funds in the escrow account or it would terminate the banking relationship. A similar letter was sent to Capriotti that was copied to Peloza. *Id.*, Ex. 57. LaSalle Bank terminated the relationship because adequate funds were not deposited in the escrow account. Peloza concedes in January 2000 she was informed 60 escrow checks were returned from Harris Bank because of insufficient funds. *Id.*, Ex. 10 at 139. Viewed in the light most favorable to Fidelity, the two LaSalle Bank 1999 letters and the 60 deficient checks raise a genuine issue for trial as to whether Peloza had knowledge of escrow shortages prior to February 2000.

Peloza and Cornell deny responsibility for escrow mismanagement and blame ITI Enterprises. Although ITI Enterprises was responsible for escrow management, Fidelity presents evidence the escrow accounts were expressly under New Intercounty's name.[1] Pl. 56.1 Facts at ¶ 50, Ex. 2, at p. 317-18. New Intercounty deposited funds from title closings into its escrow accounts in the regular course of business. ITI Enterprises employed Cornell and Peloza as consultants, suggesting their knowledge of ITI Enterprises' operations. *Id.*, Ex. 44. Fidelity offers evidence demonstrating a closely intertwined New Intercounty-ITI Enterprises relationship. It is undisputed Cornell and Peloza used INTIC and New Intercounty funds for personal expenses, obtained loans without repayment, and failed to execute loan agreements. Although these loans were not directly obtained from escrow accounts, New Intercounty and INTIC's funds were transferred from inadequate escrow accounts. *Id.* at ¶ 52. Under the INTIC-New Intercounty underwriting agreement,

---

[1] For purposes of summary judgment, the parties assume the existence of an escrow deficiency over $40 million in the accounts.

9

New Intercounty had direct responsibility to safely maintain escrow account funds. *Id.* at ¶ 66. Fidelity advances evidence of a $50,000 loan that was disbursed to Peloza from an escrow account for the construction of Peloza's personal swimming pool. Pl. 56.1 Facts, Ex. 14, at 59-60. Viewed in the light most favorable to Fidelity, there is a genuine factual dispute as to the Intercounty defendants' participation in an escrow Ponzi scheme.

###### B. Duty to Disclose

Fidelity must demonstrate Peloza and Cornell had a duty to disclose escrow deficiencies. Fidelity's fraudulent concealment claim is asserted against INTIC, New Intercounty, Cornell, and Peloza. An escrowee owes a fiduciary duty to escrow beneficiaries whose escrow accounts it holds in trust. *Fantino v. Lenders Title and Guaranty Co.*, 303 Ill. App. 3d 204, 208, 707 N.E.2d 756 (2d Dist. 1999); *TRW Title*, 153 F.3d at 824. A duty to disclose exists when one party places trust and confidence in another party. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 401, 675 N.E.2d 584, 593 (1996). New Intercounty was responsible for safely maintaining the deposited escrow funds. Pl. 56.1 Facts at ¶ 66. Fidelity and INTIC were parties to a reinsurance agreement. Fidelity insured the risk of default on INTIC's title insurance policies. These material facts are probative evidence of a mutual relationship of trust and confidence.

Fidelity provided reinsurance for title closings with the expectation that escrow funds would be properly distributed. Viewed in the light most favorable to Fidelity, a reasonable jury could conclude INTIC and New Intercounty owed a duty to disclose the escrow shortages.

Corporate officers may be individually liable for torts of the corporation in which they personally participated. *See Motchs v. Pine Roofing Co.*, 178 Ill. App. 3d 169, 176, 533 N.E.2d 1, 6 (1st Dist. 1988); *Kaeser & Blair, Inc. v. Willens*, 845. F.Supp. 1228, 1234 (N.D. Ill. 1993). Peloza

and Cornell are the only officers of INTIC and New Intercounty. Fidelity has raised a genuine factual issue as to whether Peloza and Cornell participated in a Ponzi scheme. Fidelity's individual claims against Peloza and Cornell for fraudulent concealment survive summary judgment.

### C.     Reasonable Inspection and Inquiry

Under the fraudulent concealment doctrine, Fidelity must demonstrate it engaged in a reasonable investigation of the Intercounty defendants' escrow practices between 1995 and 2000. *See TRW Title*, 153 F.3d at 828. This court granted summary judgment against Fidelity on its fraudulent concealment claim against the Stewart defendants. *See Fidelity v. Intercounty*, No. 00 C 5658, 2001 WL 1414517, at *4-5 (N.D. Ill. Nov. 13, 2001). Fidelity failed to conduct a reasonable inquiry and investigation into Old Intercounty's escrow practices before undertaking the Fidelity-INTIC reinsurance agreement. Specifically, Fidelity failed to conduct a pre-signing audit, obtain Old Intercounty's financial statements, and inquire into Old Intercounty's past escrow transactions. *Id.* The court did not address Fidelity's relationship with the Intercounty defendants after September 1995.

The Intercounty defendants do not argue Fidelity failed to conduct reasonable inspections or investigations. The Intercounty defendants do not present evidence demonstrating a lack of reasonably inquiry. Nor does Fidelity address the reasonable investigation requirement. In a single footnote in their reply brief, the Intercounty defendants refer the court to Stewart's memorandum of law and Rule 56.1 statement of facts for arguments on Fidelity's lack of reasonable due diligence. It is well-settled that arguments not raised until the reply brief are waived. *United States v. Turner*, 203 F.3d 1010, 1019 (7th Cir. 2000); *Marshall v. Golfview Development Center, Inc.*, No. 99 C 7384, 2001 WL 648628, at *7 (N.D. Ill. Jun. 7, 2001). The Intercounty defendants' argument on the

11

reasonable investigation prong is undeveloped and unsupported. Accordingly, the court cannot address the reasonable inquiry element of the fraudulent concealment claim. Summary judgment on Count I must be denied.

## III. Breach of Fiduciary Duty [Count II]

Fidelity asserts a breach of fiduciary duty claim as assignee and subrogee of escrow beneficiaries. The Intercounty defendants contend Fidelity cannot establish that Peloza, Cornell, or INTIC owed a fiduciary duty to the escrow beneficiaries. A fiduciary relationship arises as a result of the "special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 672, 682 N.E.2d 314, 321 (1st Dist. 1997). Superiority and influence must be substantial. *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 21, 653 N.E.3d 968, 975 (2d Dist. 1995). Escrow agents owe escrow depositors a duty to maintain and disburse their funds in accordance with the escrow agreement. *TRW Title*, 153 F.3d at 829. "Escrowees have been found to owe a fiduciary duty both to the party making the deposit and the party for whose benefit it is made." *Fantino*, 303 Ill. App. 3d at 208, 707 N.E.2d at 759; *see also Miguel v. Belzeski*, 797 F. Supp. 636, 642 (N.D. Ill. 1992) (escrowee has a fiduciary duty to parties of an escrow agreement).

New Intercounty argues ITI Enterprises managed the escrow account. Def. 56.1 Facts at ¶¶ 20, 23, 24. New Intercounty concludes it did not owe a fiduciary duty to the escrow depositors. But the escrow account was identified as a New Intercounty account. Pl. 56.1 Facts, Ex. 2, at p. 317-18. New Intercounty was responsible to safely maintain escrow funds under the INTIC-New Intercounty agreement. LaSalle Bank corresponded with New Intercounty about its insufficient escrow account. New Intercounty deposited escrow funds in the course of its business as a title agent. These material

facts create a genuine dispute as to whether New Intercounty owed a fiduciary duty to escrow depositors as the escrow account owner. A reasonable jury could conclude New Intercounty participated in escrow mismanagement. Use of escrow funds for improper purposes can constitute a breach of fiduciary duty. *See TRW Title Ins. Co. v. Security Union Title Ins. Co.*, No. 93 C 7555, 1994 WL 194262, at *4 (N.D. Ill. May 16, 1994). Fidelity's breach of fiduciary duty claim against New Intercounty survives summary judgment.

The Intercounty defendants contend INTIC, INTIC Holding, Peloza, and Cornell are not fiduciaries of the escrow depositors because they are not title or escrow agents. Fidelity imputes liability to those entities and individuals under the alter ego or piercing the corporate veil theory. Peloza and Cornell respond that INTIC, New Intercounty, and INTIC Holding maintained separate bank accounts, records, and books that preclude application of the piercing the corporate veil theory. Def. 56.1 Facts, Ex. A-1 at ¶¶ 12-13, Ex. A-2 at ¶¶ 15-16. Under Illinois law, Fidelity must establish two requirements for piercing the corporate veil. "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual or other corporation no longer exist; and second, circumstances must be such that adherence to the fiction of a separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods, Inc. v. MNP Corp.*, 18 F.3d 1384, 1389 (7th Cir. 1994). Factors that are considered include: failure to maintain adequate corporate formalities, commingling of funds or assets, and undercapitalization. *Main Bank of Chicago v. Baker*, 76 Ill.2d 188, 205, 427 N.E.2d 94, 102 (1981); *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985).

New Intercounty is INTIC's title agent. INTIC Holding's sole function is to hold INTIC stock; it has no employees. INTIC Holding, INTIC, and New Intercounty are located in the same

Chicago office; the companies are not separated within that office. Cornell and Peloza are the sole officers and directors of INTIC and New Intercounty, and the sole owners of INTIC Holding stock. New Intercounty acted as INTIC's exclusive agent and sold its title insurance policies. Common management, business purpose, operations, and equipment demonstrate a lack of respect for the corporate form. *Dimmit & Ownes Financial, Inc. v. Superior Sports Products, Inc.*, 196 F.Supp.2d 731, 741 (N.D. Ill. 2002). Fidelity advances substantial evidence Cornell and Peloza used corporate funds for personal expenses. The funds were obtained as purported personal loans without executed loan agreements. Cornell and Peloza did not repay the loans to INTIC or New Intercounty. Viewed in the light most favorable to Fidelity, the evidence suggests commingling of corporate accounts with personal funds. *See Main Bank of Chicago*, 76 Ill.2d at 205, 427 N.E.2d at 102; *see also Dimmit & Ownes*, 196 F.Supp.2d at 741 (corporate funds used for personal expenses is evidence of an alter ego relationship). Fidelity raises a genuine factual dispute as to whether INTIC, INTIC Holding, Peloza, and Cornell were New Intercounty's alter egos.

Finally, the Intercounty defendants incorrectly assert Fidelity failed to plead an alter ego theory in its amended complaint. The complaint specifically alleges unity of interest among INTIC, INTIC Holding, New Intercounty, Peloza and Cornell. *See* Amended Compl. at ¶ 21. Accordingly, summary judgment must be denied on Count II.

## IV.    Breach of Contract [Count IV]

Fidelity asserts a breach of contract claim against New Intercounty as assignee and subrogee of the escrow beneficiaries. Fidelity imputes liability to INTIC, INTIC Holding, Cornell, and Peloza under the alter ego doctrine. The Intercounty defendants assert there is no valid, enforceable contract between the escrow beneficiaries and New Intercounty.

14

To establish a breach of contract claim under Illinois law, Fidelity must demonstrate: the existence of a valid and enforceable contract; the escrow beneficiaries performed the contract; New Intercounty breached the contract; and the escrow beneficiaries suffered an injury. *See Henderson-Smith & Assoc. v. Nahamani Family Serv.,* 323 Ill. App. 3d 15, 27, 752 N.E.2d 33, 43 (1st Dist. 2001); *Applied Industrial Materials v. Mallinckrodt,* 102 F.Supp.2d 934, 937 (N.D. Ill. 2000). At the outset, Fidelity argues the Intercounty defendants fail to meet their burden of production on summary judgment. Fidelity asserts New Intercounty cannot rest on its argument that valid contracts between New Intercounty and the escrow beneficiaries do not exist. However, a movant may satisfy its initial burden of production by demonstrating there is an absence of evidence to support the non-movant's claims. *Green,* 17 F.3d at 201. A complete failure of proof concerning an essential element of the non-movant's claim renders other facts immaterial. *Celotex,* 477 U.S. at 322-23. The movant need not provide affidavits or deposition testimony establishing the nonexistence of an essential element. *Id.* at 324. ("the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case") (internal citations omitted).

Fidelity fails to present evidence of escrow contracts between the escrow depositors and New Intercounty. Fidelity offers only conclusory arguments about escrow instructions that were breached. Fidelity points to two disbursement agreements in the record. *See* Pl. 56.1 Facts, Ex. 78, 79. Those disbursement agreements are facially incomprehensible. No foundation is provided for their authenticity. *See Woods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir. 2000) (evidence submitted at summary judgment must be admissible under Federal Rules of Evidence). Fidelity offers no explanation about the identities of the parties to the disbursement agreements or the agreements'

15

relevance to escrow accounts.[2] *Id.* at ¶¶ 64, 65. Indeed, the two disbursement agreements state the contract parties are buyers and sellers, not New Intercounty and escrow depositors. *Id.*, Ex. 78. Further, Fidelity points to a large group of records that include "settlement statements indicating settlement services paid in connection with the transaction[.]" *Id.*, Ex. 85, Partington Aff. at ¶ 2. Fidelity does not explain how these unorganized financial documents constitute a contract. Nor does Fidelity point to terms in the purported contracts that were breached.

The legal relationship between parties to a real estate transaction and an escrowee is detailed in the closing escrow agreement, which contains specific escrow instructions. *TRW Title,* 153 F.3d at 824. Fidelity fails to offer evidence of escrow instructions between New Intercounty and the escrow beneficiaries that were expressly breached by escrow mismanagement and non-payment. Fidelity does not identify the escrow beneficiaries. Fidelity points to the New Intercounty-INTIC agreement that provides New Intercounty must safely maintain funds in the escrow account. But the escrow beneficiaries are not parties to that agreement. Nor does Fidelity argue they are third-party beneficiaries to the New Intercounty-INTIC agreement. *See Christakos v. Intercounty Title Co.*, No. 99 C 8334, 2001 WL 138896 (N.D. Ill. Feb. 16, 2001) (escrow beneficiary was not a third-party beneficiary to the INTIC-New Intercounty escrow agreement). This court is not required to scour the record looking for the existence of relevant contracts to support Fidelity's breach of contract claim. *See e.g. Radimecky v. Mercy Health Care*, No. 00 C 2889, 2001 WL 1002521, at *11 (N.D.

---

[2] In its Rule 56.1 Facts ¶¶ 64 and 65, Fidelity offers a meager description of the disbursement agreements and settlement statements. The fact statements are not supported by the record citations. Accordingly, the paragraphs are not considered. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1167 (7th Cir. 1997).

Ill. Aug. 29, 2001) (summary judgment granted on breach of contract claim absent evidence of a valid contract).

In addition, Fidelity asserts New Intercounty and the escrow beneficiaries have an implied contract in law that prevents New Intercounty from misappropriating escrow funds. Fidelity confuses its breach of express contract claim with unjust enrichment. An implied contract claim is identical to a claim for unjust enrichment . *See People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill.2d 473, 496, 607 N.E.2d 165, 177 (1992); *Peleschak v. Verex Assurance, Inc.*, 272 Ill. App. 3d 1077, 1083, 651 N.E.2d 562, 566 (1st Dist. 1995); *Knaus v. Dennler*, 170 Ill. App. 3d 746, 751, 525 N.E.2d 207, 210 (5th Dist. 1988). Fidelity asserts unjust enrichment in Count VII. Fidelity's breach of contract claim fails as a matter of law. Summary judgment must be granted on Count IV.

**V.      Unjust Enrichment [Count VII]**

To establish unjust enrichment, Fidelity must prove: (1) the Intercounty defendants received a benefit; (2) to Fidelity's detriment; and (3) New Intercounty's retention of that benefit is unjust. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160, 545 N.E.2d 672, 679 (1989). Fidelity asserts unjust enrichment in its own capacity and as assignee and subrogee of escrow beneficiaries.

The Intercounty defendants contend Fidelity fails to demonstrate they improperly received a benefit. The conclusory argument lacks merit. A reasonable jury could conclude the Intercounty defendants participated in a Ponzi scheme. Fidelity replaced escrow checks that failed to clear pursuant to terms of the insured closing letters and title reinsurance policies. Pl. 56.1 Facts, Ex. 85 at ¶¶ 1-10. Thus, Fidelity raises a genuine issue as to whether the Intercounty defendants benefitted from indemnification of escrow claims.

17

The Intercounty defendants contend Fidelity is primarily liable for the escrow claims and cannot assert an unjust enrichment claim as a subrogee. Under Illinois law, the doctrine of subrogation allows a creditor to enforce rights of the payee by collecting from the party who should have discharged the debt. *Aetna Casualty & Surety Co. v. Chicago Insurance Co.*, 994 F.2d 1254, 1257 (7th Cir. 1993) (citing *Dix Mutual Ins. Co. v. LaFramboise*, 149 Ill.2d 314, 597 N.E.2d 622, 624 (1992)). Although Illinois courts liberally apply subrogation principles, Fidelity must demonstrate: (1) it paid the debt in full; (2) the Intercounty defendants were primarily liable for the debt; and (3) the escrow parties possessed a right enforceable against the Intercounty defendants. *American Nat'l Bank and Trust Co. of Chicago v. Weyerhaeuser Co.*, 692 F.2d 455, 461 (7th Cir. 1982). Subrogation prevents injustice and unjust enrichment. *Dix Mutual*, 149 Ill.2d at 319, 597 N.E.2d at 624.

The Intercounty defendants argue Fidelity was primarily liable for the escrow deficiencies because it was obligated to reimburse the escrow beneficiaries under the reinsurance agreement and joint insured closing letters. The Intercounty defendants misconstrue the concept of primary liability. A reinsurance agreement "involves contracts of indemnity, not liability . . . the reinsurer is not directly liable to the original insured." *Stonewall Ins. Co. v. Argonaut, Ins.*, 75 F.Supp.2d 893, 909 (N.D. Ill. 1999). The joint closing protection letters expressly provided Fidelity would *reimburse* the escrow beneficiaries if fraud occurred in handling their deposits. Def. 56.1 Facts, Ex. 2. The Fidelity-INTIC reinsurance agreement is an indemnification agreement. *Id.*, Ex. 1. Primary liability, in the context of subrogation, requires Fidelity to have actually caused injury to the escrow beneficiaries. *TRW Title*, 153 F.2d at 829; *see also American Nat'l Bank v. Weyerhaeuser Co*, 692

18

F.2d 455, 461 (7th Cir. 1982) ("equity will permit only parties free from wrongdoing themselves to assert rights of subrogation against third parties"). Thus, the joint closing protection letters and reinsurance agreement do not impute primary liability to Fidelity. *See Doherty v. Davy Songer, Inc.*, 195 F.3d 919, 927 (7th Cir. 1999) (plaintiff could act as subrogor when it paid claims as the insurer). Fidelity may assert an unjust enrichment claim as subrogee and assignee of the escrow beneficiaries. Summary judgment on Count VII must be denied.

## VI. Conversion [Count VIII]

Fidelity asserts a conversion claim as subrogee and assignee of escrow beneficiaries. To establish conversion, Fidelity must demonstrate the Intercounty defendants: (1) wrongfully assumed control, dominion, or ownership over property of the subrogors and assignors; and (2) the subrogors and assignors have an absolute and unconditional right to immediate possession of the property. *Voutiritas v. Intercounty Title*, 279 Ill. App. 3d 170, 186, 664 N.E.2d 170, 181 (1st Dist. 1996).

The Intercounty defendants contend ITI Enterprises managed the escrow account and conclude they could not assume wrongful dominion or control over the escrow funds. In response, Fidelity presents evidence the escrow account was under New Intercounty's name. *See* Pl. 56.1 Facts, at ¶ 50. The New Intercounty-INTIC underwriting agreement expressly required New Intercounty to safely maintain the escrow fund. *Id.* at ¶ 66. LaSalle Bank corresponded with Peloza when a shortage occurred in the New Intercounty escrow account. *Id.*, Ex. 72. These material facts create a genuine issue as to whether New Intercounty or ITI Enterprises controlled the escrow account.

Fidelity has raised a genuine dispute for trial as to whether the Intercounty defendants participated in an escrow Ponzi scheme. Misappropriation of escrow depositors' funds constitutes

wrongful ownership or control. *See Arifin v. Schude*, No. 98 C 1591, 1999 WL 342395 (N.D. Ill. May 14, 1999) (a claim for misappropriation is identical to a conversion claim); *Wabash Independent Oil Co. v. King & Wills Insurance Agency*, 248 Ill. App. 3d 719, 725, 618 N.E.2d 1214, 1218 (5th Dist. 1993) (same). And ITI Enterprises' management of the escrow account does not preclude New Intercounty from having joint control or ownership. Finally, Fidelity's conversion claim concerns wrongful control and ownership of escrow funds, not the escrow account itself. ITI Enterprises' management of the account is not dispositive of misappropriation of funds deposited in the account. Viewing the evidence in the light most favorable to Fidelity, a reasonable jury could conclude the Intercounty defendants assumed wrongful ownership of the escrow funds. Fidelity raises a genuine factual dispute on its conversion claim. Summary judgment on Count VIII must be denied.

## VII. Illinois Title Insurance Claim [Count VI]

The Illinois Title Insurance Act prohibits: (1) material misstatement or fraudulent misrepresentation in the handling of escrow accounts; (2) misappropriation or tortious conversion of money held in a fiduciary capacity; (3) untrustworthiness or incompetence in transacting business in a manner that endangers the public; and (4) material misrepresentation in the terms or conditions of contracts. 215 ILCS § 155/21(a). Section 25 provides, "Any person or persons who violate the prohibitions or limitations of subsection (a) of Section 21 of this Act shall be liable to the person or persons charged for the settlement service involved in the violation for actual damages." 215 ILCS § 155/25. Fidelity asserts an Illinois Title Insurance claim as assignee and subrogee of the escrow beneficiaries.

The Intercounty defendants contend summary judgment is warranted because they did not

have knowledge of escrow deficiencies or participate in the New Intercounty escrow accounts. The Intercounty defendants reassert their arguments on the fraudulent concealment and conversion issues.

Section 21(a) prohibits fraudulent misrepresentation, misappropriation, conversion, and untrustworthiness in transacting title insurance to the public. A § 21(a) claim is akin to a fraudulent concealment or conversion claim. *See Fidelity*, 2001 WL 477162; *see also Lawyer's Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822-23 (N.D. Ill. 1995). Fidelity has raised a genuine factual dispute as to the Intercounty defendants' participation in a fraudulent escrow scheme. Accordingly, summary judgment must be denied on Count VI.

## VIII. Fidelity's Motion for Partial Summary Judgment

Fidelity's moves for partial summary judgment seeking to bar the Intercounty defendants from deflecting responsibility for escrow deficiencies to ITI Enterprises. The Intercounty defendants respond that Fidelity's motion is procedurally improper.

Rule 56(c) of the Federal Rules of Civil Procedure does not permit parcing claims into sub-issues for resolution on summary judgment. *See Capitol Records, Inc. v. Progress Record Distributing, Inc.*, 106 F.R.D. 25, 30 (N.D. Ill. 1985). "To hold that judgment could be entered and an appeal taken on part of a claim would result in bifurcated proceedings that could only delay unnecessarily the progress of the litigation." *Id.* at 28; *Arado v. General Fire Extinguisher Corp.*, 626 F. Supp. 506, 509 (N.D. Ill. 1985). A motion for partial summary judgment is commonly utilized where some of the non-movant's claims can be addressed as a matter of law. Partial summary judgment is an accepted procedure for addressing affirmative defenses or the liability portion of a claim. *See e.g. United States v. Bruno*, No. 00 C 1686, 2000 WL 1530017 (N.D. Ill. Oct. 13, 2000); *LCI Int'l Telecom Corp. v. American Teletronics Long Distance, Inc.*, 978 F.Supp. 799,

802 (N.D. Ill. 1997); *Wildey v. Springs*, No. 92 C 8146, 1993 WL 350195, at *1 (N.D. Ill. Sept. 7, 1993).

Fidelity's partial summary judgment motion does not relate to a particular affirmative defense, counterclaim, or cross-claim. Nor does Fidelity identify any of its own claims as a basis for its summary judgment motion. *See Taylor v. Bekins Van Lines*, No. 95 C 2286, 1996 WL 14004, at *5 (N.D. Ill. Jan. 12, 1996) (refusing to entertain plaintiff's motion for partial summary judgment on sub-issue of whether contract existed in a breach of contract claim). Instead, Fidelity expects the Intercounty defendants to argue at trial that ITI Enterprises is responsible for escrow mismanagement. Fidelity is concerned about jury confusion and seeks to exclude the Intercounty defendants' argument. Fidelity's motion is procedurally improper. Rule 56(c) does not permit piecemeal litigation. *See Bakalis v. Bd. of Trust. Of Community College Dist. No. 504*, 948 F. Supp. 729, 735, n.4 (N.D. Ill. 1996) ("Granting summary judgment on part of a claim is improper"). The motion does not relate to a claim or affirmative defense on which the court can enter judgment. Accordingly, Fidelity's motion for partial summary judgment must be denied.

## CONCLUSION

The Intercounty defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted for the Intercounty defendants and against Fidelity on Count IV, and denied on Counts I, II, VI, VII, and VIII. Fidelity's motion for partial summary judgment is denied.

July 3, 2002

ENTER:

_Suzanne B. Conlon_
Suzanne B. Conlon
United States District Judge