

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK,<br>   Plaintiff,<br><br>v.<br><br>INTERCOUNTY NATIONAL TITLE INSURANCE COMPANY, INTERCOUNTY TITLE COMPANY OF ILLINOIS, INTIC HOLDING COMPANY, STEWART TITLE COMPANY, STEWART TITLE GUARANTY COMPANY, STEWART INFORMATION SERVICES CORP., et. al.,<br><br>   Defendants. | No. 00 C 5658<br><br>Honorable Charles R. Norgle |

## MEMORANDUM OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is Defendant Stewart Information Services Corporation's, Stewart Title Guaranty Company's and Stewart Title Company's Motion for Summary Judgment on Counts III, VII and IX of Plaintiff Fidelity National Title Insurance Company of New York's ("Fidelity") Amended Complaint ("Complaint"). For the following reasons, the motion is granted.

## I. BACKGROUND

### A. Facts

#### *1. Stewart and Old Intercounty*

Stewart Title Guaranty ("Stewart"), at all relevant times, has been in the business of underwriting title insurance. In 1984 Stewart Title Company, a subsidiary of Stewart, entered

into an agreement with Laurence Capriotti ("Capriotti") and Jack Hargrove ("Hargrove") to purchase Intercounty Title Company of Illinois ("Old Intercounty"). Under the proposed agreement ("Master Agreement") Stewart would own a 20% stake in the company, while Capriotti and Hargrove would own equally the remaining 80%. Stewart and Old Intercounty also executed an exclusive underwriting agreement through which Old Intercounty would serve as the exclusive agent of all title insurance policies issued in the Chicagoland area on Stewart's behalf. In line with the agreement, Old Intercounty was required to "furnish Stewart balance sheets of [Old Intercounty] along with income and expense statements prepared in accordance with generally accepted accounting principals, no later than the fifteenth (15th) day of each month for the preceding month... ." The Master Agreement further required Hargrove and Capriotti to maintain Old Intercounty's net worth at $1,000,000.

In 1993 Stewart sought additional protections from Capriotti with regard to Old Intercounty's finances. The parties entered into several arrangements that allowed Stewart to conduct a privilege review of Old Intercounty's financial statements and escrow reconciliations. Stewart discovered through its privilege review that, beginning in 1987, Old Intercounty incurred significant overdrafts. On further review, Stewart concluded that Old Intercounty was approximately one year behind on reconciling its escrow account and a substantial shortage remained outstanding in overdrawn file balances. Stewart eventually discovered that, beginning in 1986, Hargrove and Capriotti diverted much of Old Intercounty's escrow funds to the acquisition of real estate, the company's risky "defeasance program" and to other questionable investments. Stewart determined that, in either 1990 or 1991, virtually all obligations owing from Old Intercounty to Stewart were uncollectible.

Despite the results of the investigation, Stewart nevertheless failed to inform state regulators of Old Intercounty's financial situation or its potential effect on the company. Rather, in 1995 Stewart and Old Intercounty began negotiating a Restructuring Agreement to settle the parties' financial disputes. During these discussions Stewart told Capriotti that if Old Intercounty did not restore the shortages in the escrow account, Stewart would contact state regulators and inform them of Old Intercounty's finances. The parties finalized the Restructuring Agreement in April 1995.

### 2. *Creation of New Intercounty with Fidelity as Reinsurer*

In early 1995 Capriotti began discussions with Thomas Simonton ("Simonton") of Commonwealth Land Title Insurance Company ("Commonwealth") regarding Capriotti's intent to restructure Old Intercounty and to create a new underwriter, reinsured by Commonwealth instead of Stewart. About a month later, Simonton attended a meeting with several Old Intercounty executives, during which Capriotti set forth his plans to create a new underwriter, Intercounty National Title Insurance Company ("INTIC"), and a new title agent, Intercounty Title Insurance Company of Indiana ("New Intercounty"), for which a new management company, ITI Enterprises (owned by Capriotti and Hargrove), would provide financial and other services. Shortly following this meeting, Simonton entered employment discussions with Fidelity, who agreed to supply reinsurance to New Intercounty in place of Commonwealth as soon as Simonton signed on with the company. Fidelity did, in fact, enter a "Reinsurance Agreement" with New Intercounty. Fidelity, however, did not ask for bank records, financial statements, background checks, reconciliations or other documents relating to Old Intercounty's escrow account prior to executing the parties' agreement.

### *3. Funds from New Intercounty Are Diverted to Old Intercounty*

Between November 1995 and December 1997, approximately $25.2 million, which should have been deposited into New Intercounty's Escrow account, was used to fund real estate closings conducted by Old Intercounty, for which Stewart continued to issue title insurance policies. In total, 138 Old Intercounty real estate closings were funded in part with New Intercounty escrow funds. As a reinsurer to New Intercounty's underwriter, Fidelity was ultimately responsible for any losses due to New Intercounty's missing escrow funds.

In March 2000 certain principals of New Intercounty informed Simonton that a possible shortage existed in New Intercounty's escrow accounts and requested that Fidelity investigate the matter. On March 13, 2000 Fidelity commenced an audit of New Intercounty's escrow accounts, through which it recognized that it may be open to a substantial liability because of the missing escrow funds. On March 17, 2000 Fidelity obtained Hargrove's agreement to pledge additional collateral in exchange for Fidelity's release of any and all claims arising from the missing escrow funds. At the time Fidelity entered this agreement, Hargrove represented that the deficiency in New Intercounty's escrow account was between $8 and $10 million.

### *4. Fidelity's Full Investigation of New Intercounty*

On March 24, 2000 Fidelity renewed its Reinsurance Agreement with New Intercounty for five years. From March 13 through April 20, 2000 Fidelity sought to determine the status of New Intercounty's escrow accounts. To do so, Fidelity entered a "Monitoring Agreement" with several parties under which Fidelity gained the right to audit and monitor New Intercounty's escrow accounts. Pursuant to the Monitoring Agreement, Fidelity had the authority "to control, monitor, report, advise, audit, and direct all aspects of the escrow account department and accounting department of [New] Intercounty." Two of Fidelity's executives believed that, in line

4

with the Monitoring Agreement, Fidelity operated New Intercounty "on the float." On April 20, 2000 Fidelity's auditors reported a shortage in New Intercounty's escrow accounts of at least $46 to $47 million, and potentially as high as $55 to $56 million.

On April 21 Simonton notified New Intercounty representatives that the Reinsurance Agreement terminated immediately. In response, New Intercounty representatives vehemently called into doubt Fidelity's auditors' findings. Hargrove was even willing to put up additional collateral to assure that Fidelity was secure, since he believed that Fidelity's auditors were incorrect. On April 23 Fidelity obtained a commitment from Hargrove to pledge collateral to cover the entire escrow shortfall and thus reinstated the Reinsurance Agreement. Between May and June 2000 Fidelity deposited $16,874,677.05 of its own funds into New Intercounty's escrow account to cover shortages as they were identified. Fidelity also paid approximately $36,285,373.89 in escrow claims that stemmed from the shortages.

On May 8, 2000 Deloitte & Touche ("Deloitte") began to conduct a forensic audit of the New Intercounty escrow account. On June 19, 2000 Deloitte issued a preliminary report, confirming that the escrow shortages were caused by theft. The next day Fidelity advised state regulators of the results of Deloitte's investigation. Fidelity then met with the FBI, the IRS and the United States Attorney's Office to advise them of Deloitte's findings.

## B. Procedural History

This case comes before the Court after almost seven years of protracted litigation involving two other District Judges, one jury trial, two appeals to the Seventh Circuit and a plethora of substantive rulings. This Court now has the task of sorting through a lengthy and complex record from which it must discern whether any genuine issues of material fact exist as to the only three remaining Counts.

Fidelity originally filed a twelve-count complaint in its own capacity and as an assignee and subrogee of New Intercounty's escrow beneficiaries alleging a variety of claims against Stewart. On May 2, 2001 Judge Conlon of this District Court dismissed with prejudice Count III (assisting in the breach of fiduciary duty), Count V (violation of Illinois Consumer Fraud Act) and Counts IX-XII (fraudulent transfers, negligence, subrogation and implied indemnity). Judge Conlon subsequently denied Fidelity's motion to reconsider the May 2, 2001 Order in a minute order entered on June 5, 2001.

On November 13, 2001 Judge Conlon granted summary judgment on Count I (fraudulent concealment) because, the Court reasoned, Fidelity failed to conduct a reasonable investigation of New Intercounty's escrow practices and failed to establish Stewart's actual knowledge of Old Intercounty's escrow deficiencies before September 1995, which viciated any fraudulent intent on Stewart's behalf. Judge Conlon also granted summary judgment on Count VII (unjust enrichment) to the extent Fidelity brought the claim in its own capacity. Judge Conlon denied summary judgment on Count VII to the extent Fidelity brought the claim as a subrogee and assignee. Finally, Judge Conlon granted summary judgment on Count VIII (conversion) and Count VI (violation of the Illinois Title Insurance Act) because, as to Count VI, Fidelity failed to establish Stewart's knowledge of the escrow deficiencies before execution of the Fidelity-New Intercounty agreement.

On April 12, 2004 the parties proceeded to trial on Fidelity's unjust enrichment and intentional interference claims against Stewart.[1] The jury returned a verdict for Stewart on both counts and Fidelity appealed, citing three procedural errors by Judge Der-Yeghiayan of this

---

[1] The jury also decided several issues either brought by or against Defendant Jack Hargrove, individually. These issues included Hargrove's Statute of Limitations defense and Fidelity's claims against Hargrove for a violation of the Illinois Title Insurance Act, breach of fiduciary duty and conversion.

6

District prior to trial. The Seventh Circuit, on July 11, 2005, rendered its decision reversing the judgment and remanding the case back to the District Court for a new trial.

We note that it is not within the purview of this Court to disrupt the previous rulings from the various judges assigned to this matter on any issues and claims that remain outstanding. Fidelity is now seeking to recover from Stewart damages it incurred as a result of an alleged fraudulent scheme to transfer millions of dollars from real estate escrow accounts held first by Old Intercounty and later by New Intercounty. Specifically Fidelity is seeking to hold Stewart liable under three separate theories: Aiding and Abetting (Count III); Unjust Enrichment (Count VII); and Fraudulent Transfers (Count IX), all of which allegedly arose from the parties' unique relationship. Stewart filed its Motion for Summary Judgment as to all remaining Counts. Stewart's motion is fully briefed and before this Court.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B. COUNT III – AIDING AND ABETTING

Fidelity brought Count III on behalf of the year 2000 subrogors for Stewart's alleged assistance in breaches of fiduciary duties owed to the subrogors by New Intecounty and its related entities. Before we entertain the parties' arguments as to Count III, this Court recognizes that Judge Conlon, on May 2, 2001, dismissed Count III with prejudice. The parties neither raised the issue of Count III's dismissal on appeal, nor have they challenged the decision before this Court. Thus, we find that because Judge Conlon's ruling on Count III was not the subject of subsequent litigation, it represents a final judgment that this Court must not disturb.

The law of the case doctrine should be applied unless unusual circumstances or a compelling reason render it inapplicable. Chi. & N.W. Trans. Co. v. U.S., 574 F.2d 926, 930 (7th Cir. 1978). These circumstances include substantial new evidence introduced after the first review, a decision of the Supreme Court after the first review that is inconsistent with the

8

decision on that review, and a conviction that the first decision was clearly erroneous. Id. at 930. Here, to discount the law of the case the Court must be assured that Judge Conlon's earlier decision was clearly erroneous, which is a rather high standard. See Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988) (noting that "to be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must…strike us as wrong with the force of a five-week old, unrefrigerated dead fish.").

Judge Conlon dismissed with prejudice Count III in its entirety when Fidelity failed after two attempts to plead its fraud claims with particularity. Judge Conlon did not leave room for re-litigation, but instead made it known that her decision was with prejudice. This ruling terminated Count III, and it is not for this Court to challenge Judge Conlon's ruling almost seven years later. Nevertheless, the parties seem to argue that Judge Conlon's Count III ruling missed an issue, which remains outstanding.

If we consider the parties' present arguments on Count III, Fidelity's claim fares no better. Fidelity alleges that Stewart aided and abetted the principals of Old and New Intercounty in committing a breach of their fiduciary duties. To state a claim for aiding and abetting a breach of fiduciary duty, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted in the violation. Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006) (citing Thornwood, Inc. v. Jenner & Block, 344 Ill. App. 3d 15 (2003)). Stewart argues that Fidelity cannot prove either the second or third elements of its claim.

In this instance, the primary breach of any fiduciary duties was the transfer of New Intercounty escrow funds to settle the Old Intercounty escrow deficiencies. As to Stewart's

9

knowledge of this wrongful act, Fidelity presented the following evidence: Stewart knew that Old Intercounty escrow monies were being improperly used; Stewart knew of Old Intercounty's "defeasance program" and distributions to Old Intercounty officers; and Stewart knew of the shortages of Old Intercounty's escrow account. Yet, this evidence shows nothing as to Stewart's knowledge of Old Intercounty's use of New Intercounty escrow funds to settle its escrow deficiencies. In fact, Stewart's knowledge of any shortages or improper uses of funds at Old Intercounty is limited to activities that occurred before New Intercounty was even created. And, all of the conduct that Fidelity submits to support any alleged aiding and abetting occurred well before the transfer of New Intercounty escrow funds to Old Intercounty escrow accounts, and eventually its payees. If anything, these facts merely give rise to a suspicion that Stewart knew only of Old Intercounty's escrow deficiencies. Suspicions, however, are not enough to establish Stewart's knowledge to support a claim for aiding of abetting. See Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., No. 00 C 5658, 2001 WL 1414517, at *6 (N.D. Ill. Nov. 13, 2001) (Conlon, J.) ("Mere suspicions are insufficient to establish Stewart's actual knowledge of escrow deficiencies."). With this, it is clear that Stewart could not knowingly and substantially assist a breach that was yet to happen.

We also recognize that after the 2004 jury trial, James Wallin and George Stimac, individuals who worked closely with Capriotti and Hargrove, each pled guilty to insurance fraud in violation of 18 U.S.C. § 1033 as a result of the alleged New Intercounty scheme. In their plea agreements, Wallin and Stimac admitted to, among other things, making false entries of material fact and fabricating an escrow reconciliation report to conceal the theft of millions of dollars from Old Intercounty's escrow accounts, with the intent to deceive Stewart. This agreement further cuts against Fidelity's argument that Stewart was aware of Old Intecounty's use of New

Intercounty's escrow funds. Indeed, the most favorable inference we can draw from Wallin's and Stimac's plea agreements is that Old Intercounty and its executives did whatever they could to keep Stewart in the dark regarding any escrow account deficiencies at Old Intercounty. Defendants' motion for summary judgment is granted as to Count III.

## C. COUNT VII – UNJUST ENRICHMENT

Fidelity brought its unjust enrichment claim as the contractual assignee and subrogee of the New Intercounty payees. Here, Fidelity was the only party who made whole the New Intercounty payees after New Intercounty's escrow funds were used to make the Old Intercounty payees' escrow payments. Stewart, on the other hand, paid nothing either to the Old Intercounty payees or to New Intercounty. Fidelity therefore maintains that as a subrogee it is entitled to the benefit that Stewart otherwise received when its liability to the Old Intercounty payees was extinguished. Stewart, in response, challenges Fidelity's status as a subrogee.

In Illinois, the doctrine of subrogation allows a creditor to enforce rights of the payee by collecting from the party who should have discharged the debt. Fidelity Nat'l Title Ins. Co. of N.Y., 2001 WL 1414517, at *7 (citing Aetna Cas. & Surety Co. v. Chi. Ins. Co., 994 F.2d 1254, 1257 (7th Cir. 1993)). To collect as a subrogee, Fidelity must demonstrate that: (1) it paid the debt in full; (2) Stewart was primarily liable for the debt; and (3) the escrow parties possessed a right enforceable against Stewart. See Amer. Nat'l Bank & Trust Co. of Chi. V. Weyerhaeuser Co., 692 F.2d 455, 461 (7th Cir. 1982). Yet, it is well-settled that a party who is primarily liable for another's injury cannot be subrogated to a claim, even if he pays it. TRW Ins. Co. v. Security Union Title Ins. Co., 152 F.3d 822, 827 (7th 1998). Primary liability is established in the title insurance industry where, after an escrow shortage is found, the account is run "on the float," thereby perpetuating the shortage and pushing it back to the last depositors. Id. at 829. Stewart

asserts that "[t]his is exactly what Fidelity did." Based on the testimony adduced at trial, and the evidence uncovered during discovery, we agree with Stewart on this point.

To refute Stewart's position, Fidelity relies on Judge Conlon's and Judge Der-Yeghiayan's rulings with regard to Stewart's first motion for summary judgment and Stewart's Rule 50(a) motion for a directed verdict. We note, however, that Fidelity's reliance on Judge Der-Yeghiayan's ruling on Stewart's 50(a) motion is misplaced, as the law of the case doctrine does not apply in this instance. On April 27, 2004 Judge Der-Yeghiayan denied in its entirety Stewart's motion for judgment as a matter of law and thereafter sent the case to the jury for a final determination. As such, Judge Der-Yeghiayan's findings pursuant to his decision became moot when he submitted any outstanding issues to the jury. And, while we give deference to Judge Conlon's previous denial of summary judgment on this issue, Stewart asserts that it elicited certain testimony at trial that Judge Conlon did not previously consider, but is now within the scope of this Court. With this in mind, we consider the following evidence as to whether Fidelity operated New Intercounty's escrow account "on the float."

In March and April 2000 Fidelity obtained through its Monitoring Agreement the authority to control, monitor and oversee all aspects and functions of New Intercounty's escrow account. While exercising that authority, Fidelity created new bank accounts and assigned on-site employees to audit, monitor and manage New Intercounty's escrow account. Fidelity also sent employees to New Intercounty to conduct accounting and other functions. Fidelity's counsel explained that Fidelity's right to control New Intercounty's escrow account was "unfettered." At trial, two of Fidelity's senior executives openly admitted that Fidelity operated New Intercounty's escrow account "on the float," using new deposits to pay old obligations and monitoring carefully the deposits and disbursements to keep the escrow accounts positive. What

is more, Fidelity failed to offer evidence or testimony that either refutes or raises a doubt as to the two Fidelity senior executive's statements regarding Fidelity's operation of New Intercounty's escrow account "on the float."

Amid this testimony, coupled with Fidelity's comprehensive control of New Intercounty's escrow accounts, we find that through its conduct Fidelity became primarily liable for the losses of the year 2000 subrogors. Such primary liability therefore bars Fidelity's claims as a subrogee and assignee against Stewart for unjust enrichment. TRW Ins. Co., 153 F.3d at 829. Summary judgment is granted as to Count VII.

### D. COUNT IX – FRAUDULENT TRANSFERS

Fidelity asserts that the Illinois Uniform Fraudulent Transfer Act (IUFTA) permits it to recover an obligation incurred by a debtor if that obligation was incurred with the intent to hinder, delay, or defraud a creditor. 740 ILCS § 160/1 *et. seq.* Fidelity claims that the debtors under this framework are Old and New Intercounty. It further claims that the creditors are the payees (or escrow beneficiaries) of Old Intercounty and New Intercounty, for whom Fidelity acted as an assignee and subrogee. Thus, as the assignee and subrogee of the New Intercounty payees, Fidelity in Count IX sought to recover the obligations incurred by Old and New Intercounty, when money was transferred from New Intercounty's escrow accounts to fund Old Intercounty's closings, thus extinguishing Stewart's liabilities.

#### *1. IUFTA Limitations Period*

For its first defense, Stewart argues that Fidelity's IUFTA claim is time-barred because the fraudulent transfers occurred more than four years before Fidelity commenced this action. IUFTA requires plaintiffs to file claims for fraudulent transfers within four years. See 740 ILCS § 160/10(a). Built into IUFTA is a discovery provision allowing a party to bring its claim

"within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." Fidelity Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank, et. al., 2004 WL 2106610, at *9 (N.D. Ill. Sept. 20, 2004) (Hibbler J.). This essentially "postpones the running of the statute of limitations until a party knew or should have known his injury was wrongfully caused." Id. (citing Knox College v. Celotex, 88 Ill.2d 407, 414 (1981)). The limitations period will begin to toll once a plaintiff should have reasonably known that a possible cause of action existed and should have investigated further. Fidelity Nat'l Title, 2004 WL 2106610, at *10. In fact, the statute can begin to run even if a plaintiff does not know the full extent of the injury or is not certain that a cause of action lies against a particular defendant. Hoffman v. Orthopedic Serv., 327 Ill. App. 3d 1004, 1010 (1st Dist. 2002).

Fidelity filed its IUFTA claim on September 14, 2000. Fidelity's expert, William Pollard, testified at his deposition that all disbursements from New Intercounty's escrow accounts to Old Intercounty occurred prior to January 31, 1996, almost four years and eight months before Fidelity filed its complaint. As such, Stewart maintains Fidelity's IUFTA claim has expired.

Fidelity, in response, asserts that additional transfers or disbursements may have occurred after the January 31 date, and thus a factual issue exists that supports the denial of summary judgment. But this is not enough to deny summary judgment outright. The existence of additional transfers after the January 31 date is unavailing because any injury that Fidelity may have suffered would have occurred when the first, illegitimate transfer of funds took place, which was before January 31, 1996. It is irrelevant that transfers may have occurred after this date, as Fidelity suggests, because Fidelity had already suffered the injury for which it brought the IUFTA claim. Thus, the only question remaining is the date on which Fidelity was put on

14

sufficient notice of its injury, so that it should have reasonably known that a cause of action may have existed.

On this point, Stewart argues that the alleged escrow deficit at Old Intercounty could have reasonably been discovered within the statutory period, had it not been for Fidelity's failure to conduct a reasonable investigation into Old or New Intercounty's escrow practices. In support of this argument Stewart asserts that Fidelity's expert, Bernard Pump, testified that "there was an identifiable shortage as of 1998 that would have been uncovered under proper due diligence." And, even before 1998, Simonton, as early as 1995, knew that Old Intercounty generated a large number of small claims against it, and that a rift existed between Capriotti and the Stewart management team. Stewart asserts, however, that Fidelity neither conducted nor completed an escrow account audit until March 2000, and thus it cannot rely on IUFTA's one-year discovery provision. Based on these facts, we disagree.

Despite Fidelity's failure to conduct a reasonable investigation, we are not convinced that Fidelity knew or should have known that it was a victim of any alleged fraudulent transfers within the limitations period. Stewart essentially argues that, but for a lack of investigation, Fidelity *could* have known of Old Intercounty's account deficiencies at an earlier date. This possibility, however, is not enough for this Court to make a determination on summary judgment. In essence, Stewart failed to adduce enough evidence to show that Fidelity had any reason to suspect that fraudulent transfers had occurred during the statutory period, thus putting it on notice that a possible cause of action existed and that it should have investigated further. We find that an issue of fact exists as to when Fidelity knew or should have known that it may have suffered an injury as a result of any fraudulent transfers. We therefore deny summary judgment on the IUFTA limitations period issue.

## 2. *Fraudulent Transferees*

Stewart next argues that Court IX fails because Fidelity cannot prove that any of the transfers were made to fraudulent transferees, as the escrow beneficiaries had no knowledge of the alleged deficit or its cause and thus took in good faith. To sustain an IUFTA action, a transfer must be to someone who is a fraudulent transferee, otherwise the owner of the transferred funds has no claim against the transferee to recover those funds. Fidelity Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank, et. al., 436 F.3d 836, 840 (7th Cir. 2006). To be a fraudulent transferee, one must know or suspect that the owner is not receiving any return value for the transfer of his funds, otherwise the transferee takes in good faith. See id. at 841 (citing 740 ILCS 160/9(a); Scholes v. Lehmann, 56 F.3d 750, 759 (7th Cir. 1995)). Fidelity maintains that Old and New Intercounty incurred obligations to the escrow beneficiaries in bad faith, and that Stewart directly benefitted when its liabilities to Old Intercounty's escrow beneficiaries were extinguished with New Intercounty funds. Fidelity's argument, however, has no factual basis.

In the simplest of terms, the fraudulent scheme worked as follows. Various parties deposited into New Intercounty's escrow account certain monies to be disbursed at real estate closings to pay the escrow beneficiaries – sellers, lenders and others owed funds at the end of the transaction. Corporate insiders then transferred the monies from New Intercounty's escrow account to Old Intercounty's escrow account. The monies were then disbursed from Old Intercounty's escrow account to its escrow beneficiaries, instead of New Intercounty's escrow beneficiaries. This ultimately left Fidelity holding the bag when New Intercounty's escrow beneficiaries came to collect. Stewart, in contrast, did not have to pay up.

Under this construct, the final recipients of the fraudulent transfers were Old Intercounty's escrow beneficiaries, each of whom collected as a disbursement the same amount

16

of funds deposited with Old Intercounty in the first place. Further, the funds transferred from New Intercounty were equal to those disbursed from Old Intercounty's escrow accounts to its beneficiaries. In essence, the beneficiaries, or transferees, took the money from Old Intercounty's escrow account without any knowledge that New Intercounty was not receiving any return value for the transferred funds. In this way, they simply took the money from Old Intercounty's escrow account in good faith. Nothing submitted by Fidelity supports a finding of bad faith transferees. This scenario accordingly negates Fidelity's claims under section 5(a)(1) and 5(a)(2) of IUFTA. See For Your Ease Only, Inc. v. Calgon Carbon Corp., No. 02 C 7345, 2007 WL 3357631, at *2 (N.D. Ill. 2007) (noting that UFTA makes voidable a fraudulent transfer and any subsequent transfers unless a good-faith transferee took for value).

Taking the facts in a light most favorable to the non-moving party – Fidelity – as the Court must at the summary judgment stage of the litigation, the Court finds that the undisputed facts demonstrate that Stewart did not know or suspect that the benefits received by Old Intercounty's escrow beneficiaries had a tainted origin. As we previously discussed, Stewart was aware of shortages and the improper use of funds in Old Intercounty's escrow account. The undisputed facts, however, indicate that this knowledge arose before New Intercounty was even created. There is nothing in the record to indicate that Stewart was aware of the transfer and use of funds from New Intercounty's escrow accounts to Old Intercounty's escrow accounts. As such, we find that Stewart's knowledge of a deficiency at Old Intercounty, by itself, is not enough to hold it accountable for a fraudulent transfer. Defendants' motion for summary judgment is granted as to Count IX.

## III. CONCLUSION

For the reasons stated above, Defendant Stewart Information Services Corporation's, Stewart Title Guaranty Company's and Stewart Title Company's Motion for Summary Judgment on Counts III, VII and IX of Plaintiff Fidelity National Title Insurance Company of New York's amended complaint is granted.

IT IS SO ORDERED.

ENTER:

*[signature]*

CHARLES R. NORGLE, Judge
United States District Court

DATED: 3/26/08